## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | |
|---|---|
| ATTALA COUNTY, MISSISSIPPI, BRANCH OF THE NAACP, ANTONIO RILEY, SHARON N. YOUNG, CHARLES HAMPTON, and RUTH ROBBINS,<br><br><br>                    Plaintiffs,<br><br>      v.<br><br>DOUG EVANS, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE FIFTH CIRCUIT COURT DISTRICT OF MISSISSIPPI,<br><br>                    Defendant. | Civil Action No. 4:19-CV-167-DMB-JMV |

## CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

The Attala County, Mississippi, branch of the National Association for the Advancement of Colored People ("Attala County NAACP"), Antonio Riley, Sharon Young, Charles Hampton, and Ruth Robbins (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Doug Evans ("Defendant") in his official capacity as District Attorney of the Fifth Circuit Court District of Mississippi. Plaintiffs seek to enjoin Defendant and his office from using peremptory challenges to systematically strike Black prospective jurors because of their race, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. In support of their Complaint, Plaintiffs state the following to the Court:

1

## INTRODUCTION

1.      Over the past quarter century, Defendant Doug Evans and his office have barred Black Mississippians from jury service by using peremptory challenges to strike Black jurors 4.4 times more frequently than white jurors. Plaintiffs bring this civil action to hold Defendant accountable for the policy, custom, and usage of racially discriminatory jury selection, and to secure an injunction to end this odious practice.

2.      Discriminatory jury selection practices are a recurring feature in American history. As long as the federal government has tried to extend jury service to Black citizens, state and local officials have sought ways to thwart those attempts.

3.      In the period immediately following the Civil War, state and local governments expressly barred African Americans from jury service with explicitly discriminatory laws. After Congress made jury discrimination a federal crime in 1875, and the Supreme Court barred express jury discrimination in 1880, discriminatory efforts required more circumspection.

4.      State and local governments responded with an approach that persists to this day: they endowed specific government officials with the power to make subjective—but facially neutral—decisions regarding who can and cannot serve. Those officials would use that power to exclude Black citizens from juries. At first, this authority was vested in voting registrars. Later, it shifted to grand jury commissioners. Today, it resides with prosecutors.

5.      The effort to exclude Black citizens from jury service was not an isolated endeavor. It was part and parcel of the larger project to deny African Americans full citizenship—a project with deep roots in the counties comprising Mississippi's Fifth Circuit Court District. In Winona alone, the county seat of Montgomery County, a grisly 1937 lynching spurred the U.S. House of Representatives to pass an anti-lynching bill; the notorious White Citizens' Council headquartered its state association in 1954; Emmett Till stepped off a train in 1955 near where he would be

2

abducted and murdered; and Winona police inflicted permanent injuries on civil rights activist Fannie Lou Hamer in 1963.

6.       Up the road in Grenada County, white mobs led by the KKK attacked Black schoolchildren trying to integrate the local schools in 1966. And one local election commissioner observed that as late as 1978, a candidate could not be elected without approval from the White Citizens' Council.

7.       When Evans first ran for District Attorney in Mississippi's Fifth Circuit Court District in 1991, he campaigned at multiple events sponsored by the Council of Conservative Citizens—a group formed from the membership list of the White Citizens' Council.

8.       Evans took office in 1992, and since that time, he and his assistants have employed a policy, custom, or usage of discriminatorily striking Black jurors with peremptory challenges. If a Black prospective juror is not successfully challenged for cause, there is a 50 percent chance that Evans' office will strike him or her with a peremptory challenge. If the prospective juror is white, the strike rate falls to 11 percent.

9.       This disparity, while alarming on its face, actually understates the extent of Evans' discrimination. After accounting for the effect of race-neutral variables—such as a juror's association with law enforcement or knowledge of the defendant—prospective Black jurors face 6.7 times higher odds of being struck than comparable white prospective jurors. In an opinion issued earlier this year, the United States Supreme Court described Evans' record of striking Black jurors as "extraordinary."

10.       Evans' unconstitutional policy, custom, and usage strikes at the heart of the Constitutional guarantee that all citizens may participate in self-government regardless of race. Other than voting, serving on a jury is the most substantial opportunity that most citizens have to

3

participate in the democratic process. Just as voter participation ensures the democratic character of the legislative and executive branches, jury service ensures the democratic character of the judiciary.

11.     The jury not only safeguards a person accused of a crime against the arbitrary exercise of power by a prosecutor or judge, it legitimizes verdicts to the community and conveys that the proceedings are just and fair. The institution of trial by jury ensures that members of a community can be punished only with the consent of that community.

12.     For this reason, the honor and privilege of jury service is a defining feature of what it means to be an American citizen. When state or local officials bar a citizen from service because he or she is Black, that discriminatory act is no mere indignity. It is an assertion that the prospective juror is inferior—a second-class citizen who cannot be entrusted with the responsibilities of full citizenship.

13.     The harms wrought by discriminatory jury selection extend well beyond individual jurors and the accused. Because the jury is indispensable to a government that derives its just powers from the consent of the governed, jury discrimination also causes injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.

14.     Because discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice, Plaintiffs respectfully ask that this Court enjoin Evans and his office from continuing its policy, custom, or usage of discriminatorily striking Black jurors with peremptory challenges.

## PARTIES

**A.    Plaintiffs**

15.    The Attala County NAACP, a county branch of the Mississippi State Conference of the NAACP, is a non-partisan membership organization founded in 1976 in Attala County, Mississippi. Its mission is to ensure the elimination of racial discrimination in all spheres and to advocate for political, educational, social, legal, and economic equality for all persons, and Black residents in particular. It also seeks the enforcement of federal, state, and local laws securing civil rights. Most members of the Attala County NAACP are qualified to serve as criminal trial jurors and are ready and able to do so.

16.    The Attala County NAACP brings this suit as an associational Plaintiff on behalf of its members, who are Black citizens of Attala County, are qualified for jury service in Circuit Court, and are subject to Evans' policy, custom, or usage of racial discrimination in jury selection.

17.    Plaintiff Antonio Riley is a Black citizen of the United States and Mississippi, who lives in Attala County, Mississippi. He is a registered voter who has lived in Attala County for more than a year, is older than 21, and is otherwise qualified to serve as a juror in Attala County pursuant to Miss. Code Ann. § 13-5-1.

18.    According to the United States Census Bureau's 2017 American Community Survey (ACS), Attala County has a population of 13,260 persons over age 21. At the time of the November 2018 election, 72.9 percent of adult Mississippians were registered voters; applying this figure to Attala County, it is reasonable to conclude that there are approximately 9,660 registered voters over age 21 in the county. Attala County holds two four-week Terms of Circuit Court per year. Each year, the Jury Commission of Attala County creates a jury summons list of 2,400 citizens from the database of the county's registered voters provided by the Mississippi

Secretary of State's Office. From that list, the Circuit Clerk sends jury summonses to approximately 1650 persons each year.

19.     Plaintiff Sharon N. Young is a Black citizen of the United States and Mississippi, who lives in Grenada County, Mississippi. She is a registered voter who has lived in Grenada County for more than a year, is older than 21, and is otherwise qualified to serve as a juror in Grenada County pursuant to Miss. Code Ann. § 13-5-1.

20.     In early 2004, Ms. Young (formerly last name Golden), then a resident of Montgomery County, Mississippi, reported for jury duty and was part of the jury pool for Curtis Flowers' third murder trial. Evans represented the State at Mr. Flowers' trial. During jury selection for the trial, Evans used all 15 of his peremptory challenges to strike Black jurors, including Ms. Young.

21.     According to the 2017 ACS, Grenada County has a population of 15,413 persons over age 21. Applying the statewide measurement that 72.9% of adult Mississippians are registered voters, it is reasonable to conclude that there are approximately 11,235 registered voters over age 21 in Grenada County. Grenada County holds two four-week Terms of Circuit Court per year. Each year, the Jury Commission of Grenada County creates a jury summons list of 3,500 citizens from the database of the county's registered voters provided by the Mississippi Secretary of State's Office. From that list, the Circuit Clerk sends jury summonses to approximately 1,600 persons each year.

22.     Plaintiff Charles Hampton is a Black citizen of the United States and Mississippi, who lives in Winston County, Mississippi. He is a registered voter who has lived in Winston County for more than a year, is older than 21, and is otherwise qualified to serve as a juror in Winston County pursuant to Miss. Code Ann. § 13-5-1. Mr. Hampton is President of the Winston

County, Mississippi Branch of the NAACP, and is a past President of the Mississippi State Conference of the NAACP.

23.     Plaintiff Ruth Robbins is a Black citizen of the United States and Mississippi, who lives in Winston County, Mississippi. She is a registered voter who has lived in Winston County for more than a year, is older than 21, and is otherwise qualified to serve as a juror in Winston County pursuant to Miss. Code Ann. § 13-5-1.

24.     According to the 2017 ACS, Winston County has a population of 13,797 persons over age 21. Applying the statewide measurement that 72.9% of adult Mississippians are registered voters, it is reasonable to conclude that there are approximately 10,055 registered voters over age 21 in Winston County. Winston County holds two four-week Terms of Circuit Court per year. Each year, the Jury Commission of Winston County creates a jury summons list of 3,000 citizens from the database of the county's registered voters provided by the Mississippi Secretary of State's Office. From that list, the Circuit Clerk sends jury summonses to approximately 1,500 person each year.

**B.      Defendant**

25.     Defendant Doug Evans is the District Attorney of the Fifth Circuit Court District, which comprises Attala, Carroll, Choctaw, Grenada, Montgomery, Webster, and Winston counties. He has held that office since 1992. As District Attorney, it is Evans' duty to appear in the circuit courts and to prosecute all criminal cases in which the state or county may be interested. He is also responsible for assigning the duties of other employees. Evans is a final policymaker for the Office of the District Attorney of the Fifth Circuit Court District. He is sued in his official capacity.

## JURISDICTION & VENUE

26.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3).

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## CLASS ACTION ALLEGATIONS

28.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, named Plaintiffs bring this suit on behalf of themselves and those similarly situated who have been, are, or will be affected by Defendant's unconstitutional policy, custom, or usage of exercising peremptory strikes to exclude Black citizens from criminal juries because of their race.

29.     Plaintiffs seek to represent a class comprised of Black citizens who are eligible for jury service in Mississippi's Fifth Circuit Court District. The proposed class members face an imminent threat of being denied an opportunity for jury service by Defendant's policy, custom, or usage of striking African Americans because of their race.

30.     The proposed class is so numerous that joinder is impracticable. According to the 2017 American Community Survey from the United States Census Bureau, approximately 27,932 African Americans age 21 or older live in the Fifth Circuit Court District. On information and belief, most of these residents are eligible for jury service. Statewide, 77.8 percent of adult Black Mississippians are registered to vote. Applying that percentage to the Fifth Circuit Court District, the class for which certification is requested includes 21,731 persons.

31.     There are questions of fact and law common to all class members.

32.     Common questions of fact include whether Defendant Evans has a policy, custom, or usage of exercising peremptory strikes against Black citizens because of their race.

33.     The "policy, custom, or usage" inquiry includes multiple, subsidiary common questions of fact, including whether Black prospective jurors are struck at disproportionate rates

by Evans' office and whether Defendant Evans can justify his disproportionate use of peremptory strikes against African Americans by presenting reasons other than race that account for the strikes.

34.     Common questions of law include whether Defendant has a policy, custom, or usage of exercising peremptory strikes against African Americans because of their race in violation of the Fourteenth Amendment to the United States Constitution.

35.     The questions of law and fact common to the proposed class members predominate over any questions affecting only individual members, making a class action the ideal vehicle to fairly and efficiently adjudicate the controversy.

36.     The claims of the named Plaintiffs are typical of the claims of the proposed class members. The constitutional deprivations suffered by named Plaintiffs are the same as those of the proposed class members.

37.     Defendant Evans has acted on grounds that apply generally to the proposed class, making any injunctive or declaratory relief granted appropriate to the class as a whole.

38.     Counsel for Plaintiffs have experience in class action litigation, in both Mississippi and Louisiana, and significant experience in criminal procedure and complex civil litigation.

39.     Named Plaintiffs have no interests antagonistic to the proposed class. Plaintiffs and their attorneys will fairly and adequately protect the interests of the class.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**A.    The Central Role of Jury Service in American Democracy and the Danger Posed by the Discriminatory Exercise of Peremptory Challenges**

40.    As Justice Gorsuch has recently written, "Together with the right to vote, those who wrote our Constitution considered the right to trial by jury 'the heart and lungs, the mainspring and the center wheel' of our liberties, without which 'the body must die; the watch must run down; the government must become arbitrary.' Just as the right to vote sought to preserve the people's authority over their government's executive and legislative functions, the right to a jury trial sought to preserve the people's authority over its judicial functions."[1]

41.    By requiring the consent of the people before the State can exercise its power to punish, the criminal jury acts as a critical bulwark against the arbitrary exercise of power, guards the rights of the accused, and ensures the continued acceptance of the laws by all of the people. De Tocqueville recognized that the institution of the jury "places the real direction of society in the hands of the governed" and "invests the people . . . with the direction of society."[2]

42.    Because the jury system derives from these democratic ideals, race discrimination in jury selection undermines the same foundational principles and threatens the legitimacy of our courts and the law as an institution. Thus, the Supreme Court has emphasized that "the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality, and undermines public confidence in adjudication[.]"[3]

43.    Discriminatory jury selection also inflicts serious harm on the excluded jurors themselves. The Supreme Court has explained that excluding Black citizens from jury service

---

[1] *United States v. Haymond*, 139 S.Ct. 2369, 2375 (2019) (Gorsuch, J.) (plurality opinion) (citations omitted).
[2] 1 ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 282-83 (Phillips Bradley ed., 1945).
[3] *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (internal citations and quotation marks omitted).

because of their race is practically a brand upon them and an assertion of their inferiority. The practice creates two classes of citizen and relegates African Americans to second-class status— unfit to determine the guilt or innocence of their fellow citizens. It also causes stigmatic and dignitary harm, and the profound personal humiliation suffered by the excluded juror is aggravated by its public character.

### B. The Long-Standing, Historical Use of Discretionary Procedures to Mask Racial Discrimination in Jury Selection

44. Discrimination against Black prospective jurors began with this nation's founding, but the methods of exclusion have evolved from express racial prohibitions on jury service to the exercise of discretion to block African Americans from jury service under facially neutral statutes and on pretextual grounds.

45. No African American served on a jury in the northern states before 1860, and, of course, enslaved Black persons were deprived of all rights of citizenship. The passage of the Reconstruction Amendments granted full citizenship in theory but failed to guarantee these rights in practice.

46. Even at the height of the federal government's efforts to protect the rights of freedmen during Reconstruction, some jurisdictions managed to avoid seating Black jurors altogether. In response, the Civil Rights Act of 1875 made it a crime to discriminate in the jury selection process, and the Supreme Court rejected West Virginia's facially discriminatory statute barring African Americans from jury service in *Strauder v. West Virginia*.[4]

47. The following year, in its decision of *Neal v. Delaware*,[5] the Court vacated a defendant's conviction where African Americans had been "uniformly exclu[ded]" from jury

---

[4] 100 U.S. 303, 308–09 (1880).
[5] 103 U.S. 370 (1881).

service despite a facially neutral statute. The Court issued those decisions as Reconstruction ground to a halt, and the states seized the opportunity to devise new ways to suppress jury service and jury trial rights as they simultaneously suppressed the right to vote.

48.    Mississippi led the way in these efforts to skirt the Supreme Court's rulings. The drafters of Mississippi's 1890 Constitution wished to obstruct African Americans' suffrage and prevent them from serving on juries "within the field of permissible action" under the federal Constitution.[6] They accomplished both goals by empowering registrars to determine who was eligible to vote, pegging eligibility for jury service to that determination, and then providing by statute that selected jurors be of "good intelligence, sound judgment, and fair character."[7]

49.    The registrars exercised their discrimination in the intended, discriminatory manner, and the Supreme Court gave its imprimatur to Mississippi's approach in *Williams v. Mississippi*.[8] In the Court's view, the law was constitutional because it "reach[ed] weak and vicious white men as well as weak and vicious black men."[9] *Williams* unleashed a flood of similar statutes in other states as means to disfranchise African Americans and deny them the right to serve on juries. Some local governments accomplished the same end by granting grand jury commissioners the power to summon grand and petit jurors based on the commissioners' assessment of their suitability.

50.    In the period after *Williams*, states effectively eliminated jury service and violated jury trial rights for African Americans. All-white juries repeatedly acquitted or failed to indict whites suspected of killing Black people. Emmett Till's case is illustrative. In 1955, nearly 60 years after *Williams*, 14-year-old Emmett Till disembarked at the Winona station and traveled 30

---

[6] *Williams v. Mississippi*, 170 U.S. 213, 222 (1898).
[7] *Id.* at 217 n.1.
[8] *Id.* at 222-23.
[9] *Id.* at 222.

miles east to his cousin's home. Not long after, the young Till was kidnapped, killed, and dumped in the Tallahatchie River for being accused of whistling at or near a white woman. Two of the perpetrators were charged with murder, but members of the White Citizens' Council visited every juror, and the all-white jury acquitted the defendants in one hour and five minutes.

51. Meanwhile, in Mississippi and nationally, all-white juries reliably convicted Black defendants of petty crime charges, which led to their continued economic exploitation through the practice of convict leasing. In capital cases where Black defendants escaped lynching, all-white juries ensured that they still met their deaths.

52. After decades of essentially non-existent jury service by African Americans across the country, the Supreme Court began to look behind facially neutral justifications for the dearth of Black jurors. The Court was spurred into action by the notorious prosecution of the "Scottsboro Boys," nine Black teenagers who were falsely accused of raping a white woman and then sentenced to death. In *Norris v. Alabama*,[10] the Court considered one of the defendant's challenges to his all-white jury in a county where no witness could recall African Americans ever serving on juries. The Court ruled for Norris, making clear that courts must consider not only whether a right is expressly denied but whether it is denied in substance and effect.

53. Seven years later, in *Hill v. Texas*, the Supreme Court condemned the facially neutral practice of grand jury commissioners summoning persons "with whom they were acquainted and whom they knew to be qualified to serve," where the commissioners for years "consciously omitted to place" any Black person's name on the jury list.[11] The Supreme Court again adopted a functional approach and reversed the petitioner's sentence despite the facial neutrality of the jury commissioner regime.

---

[10] 294 U.S. 587 (1935).
[11] 316 U.S. 400 (1942).

13

54.     Notwithstanding the Court's demand for non-discriminatory jury selection, jury discrimination did not end; rather, it evolved. Some prosecutors interpreted the new cases as prohibiting only the total exclusion of Black persons from jury pools, and thus worked to ensure that some—but as few as possible—Black persons entered the jury pool.

55.     This tactic was eventually prohibited by the Supreme Court in the companion cases of *Carter v. Jury Commission of Greene County*[12] and *Turner v. Fouche*.[13] Both *Carter* and *Turner* were class-action lawsuits—much like the instant case—that challenged the disproportionate (but not complete) exclusion of African Americans from the jury rolls. The Court agreed that there is "no jurisdictional or procedural bar" to such an action and that federal class-action lawsuits are an appropriate vehicle to challenge jury discrimination. And crucially, the Court agreed that disproportionate underrepresentation of African Americans provides plaintiffs with a prima facie case of discrimination, which the defendants must rebut. In both cases, the plaintiffs prevailed.

56.     But the peremptory strike remained, and prosecutors began to lean on this device to ensure that any Black prospective jurors who managed to enter the jury pool were stopped before they could serve on a petit jury.

57.     The Court's efforts to stamp out discriminatory peremptory challenges—which have been raised primarily by criminal defendants appealing their convictions—have been less successful.  The issue arose first in *Swain v. Alabama*, where the Supreme Court denied a challenge to discriminatory strikes in a county where no African Americans had yet served as petit jurors despite their presence in the jury pool. The Court dismissed the factual record in *Swain* as inadequate and denied that discriminatory strikes in an individual case could implicate the Equal Protection Clause but held that the systematic removal of African Americans in case after case

---

[12] 396 U.S. 320 (1970).
[13] 396 U.S. 346 (1970).

would raise constitutional concerns. This approach proved wholly inadequate to stem the tide of discriminatory strikes, and in the two decades following *Swain*, only two defendants were able to satisfy its requirements.

58.     In *Batson v. Kentucky*,[14] the Supreme Court acknowledged that even a single discriminatory challenge violated the constitutional rights of both the challenged juror and the defendant. It recognized that *Swain* had imposed a "crippling burden of proof" and attempted to put teeth in its prohibition against discriminatory peremptory challenges by creating a burden-shifting framework to guide the analysis of jury discrimination claims. But even as *Batson* was decided, Justice Marshall warned that it "w[ould] not end the illegitimate use of the peremptory challenge" and that its protections "may be illusory" if prosecutors could avoid violations by simply reciting facially neutral explanations for challenges.[15]

59.     These observations proved prescient. *Batson* has been honored mostly in the breach, and prosecutors have dedicated entire trainings to presenting acceptable race-neutral explanations and evading *Batson*'s strictures. Legal scholars and members of the Supreme Court have now compiled reams of evidence that the discriminatory use of peremptory challenges remains a problem. Between 2010 and 2015, at least seven empirical studies examined prosecutors' use of peremptory challenges, and all seven concurred in the basic finding that prosecutors disproportionately use peremptory challenges to exclude Black jurors.

60.     None of these studies, however, found a disparity as large as the one produced by the district attorney's office in Mississippi's Fifth Circuit Court District.

---

[14] 476 U.S. 79 (1986).
[15] *Id.* at 105, 106 (Marshall, J. dissenting).

15

### C. Doug Evans' Policy, Custom, or Usage of Striking Black Prospective Jurors

61.     Defendant Doug Evans first ran to be District Attorney for the Fifth Judicial District in 1991. Evans made two campaign stops then that foreshadowed hostility towards African Americans.

62.     On that campaign trail, Evans gave a keynote address at the Council of Conservative Citizens' meeting in Webster County. The Council of Conservative Citizens is a white supremacist group that was created from the membership lists of the White Citizens' Council. It opposes "all efforts to mix the races" and believes "the American people and government should remain European in their composition and character."[16]

63.     Evans also stumped at the Black Hawk Political Rally, which was sponsored by the Council of Conservative Citizens. The rally was a fundraiser to help pay for white children in Carroll County to attend a private all-white school and evade a federal desegregation order.

64.     Evans ultimately won the 1991 election. He has been District Attorney for the Fifth Circuit Court District ever since, only once facing a challenge for his seat. Evans ran unopposed in the 2019 election and was re-elected.

65.     Since taking office in 1992, Evans has established and continues to implement a policy, custom, and/or usage of exercising peremptory challenges to intentionally exclude African Americans from jury service in disparate fashion.

66.     Between 1992 and 2017, Evans' office prosecuted 418 criminal trials. Investigative reporters from American Public Media Reports ("APM Reports") collected the publicly available records for these trials. For 225 of the trials, APM Reports collected juror race data that permitted

---

[16] Michael Wines & Lizette Alvarez, *Council of Conservative Citizens Promotes White Primacy, and G.O.P. Ties*, N.Y. Times, June 22, 2015, https://www.nytimes.com/2015/06/23/us/politics/views-on-race-and-gop-ties-define-group-council-of-conservative-citizens.html.

an analysis of the peremptory strikes used by Evans' office. The racial breakdown of those strikes is publicly available.[17] The following allegations are made on the basis of these records, APM Reports' statistical analyses, and on information and belief.

67.     Over 225 trials, most of the 5,131 potential jurors eligible to be struck by the prosecution were white: 65 percent were white, and 35 percent were Black. But most of the 1,275 strikes used by Evans' office were exercised against Black jurors. In total, only 29 percent of jurors struck were white, and 71 percent were Black.

68.     In those 225 trials, Evans' office used peremptory strikes to remove 50 percent of eligible Black jurors. By comparison, his office used peremptory strikes to remove 11 percent of eligible white jurors.

69.     Evans' office thus struck Black jurors at a rate that is 4.4 times greater than the rate at which it struck white jurors.

70.     The office's policy, custom, and/or usage of racial discrimination in the exercise of peremptory challenges holds true for criminal trials that took place in all seven counties in the Fifth Circuit Court District. It holds true for both minor and more serious crimes. And although Evans' office disparately struck Black jurors across the board, when the defendant was Black, Evans' office's strike rate against Blacks jurors is even more pronounced—it more than doubled as compared to trials with white defendants.

71.     In 89 of Evans' trials, the public records included both race information from the venire and a transcript of the trial. For that subset of trials, APM Reports conducted a logistic

---

[17] American Public Media Reports collected and analyzed this data for use in season 2 of the podcast series *In the Dark*, which chronicles the story of Curtis Flowers, a man who has been tried by Doug Evans six different times for the same crime. *See* Will Craft, *Peremptory Strikes in Mississippi's Fifth Circuit Court District*, APM REPORTS, at 5, https://www.apmreports.org/files/peremptory_strike_methodology.pdf (last visited Nov. 7, 2019).

regression analysis to determine whether the significant disparities between white and Black strike rates could be explained by race-neutral factors. The analysis supports the conclusion that race was a powerful and statistically significant indicator of whether or not a juror was likely to be struck.

72.     After considering the importance of more than 60 variables that could influence the decision whether to strike or accept a juror—such as, *inter alia*, whether the juror had ever been accused of a crime or had a family member in law enforcement—the analysis showed that a Black juror faced odds of being struck that were 6.67 times those faced by similarly situated white jurors.[18]

### D.     Evans' Practice of Racially Discriminatory Jury Selection Is Exemplified in the Curtis Flowers Trials

73.     Evans' practice of striking Black jurors is also apparent in the various trials of Curtis Flowers. Doug Evans and his office have now tried Curtis Flowers six times for a 1996 quadruple murder in Winona, Mississippi. For five of those trials, the records indicate the race of the prospective jurors. In all five of those trials, Evans has used his peremptory strikes to target Black prospective jurors.

74.     In Flowers' first trial, Evans used peremptory challenges to strike all five Black prospective jurors. The all-white jury convicted Mr. Flowers, but the Mississippi Supreme Court reversed the conviction because of Evans' prosecutorial misconduct. Mr. Flowers raised a *Batson* challenge on appeal, but the Court's decision did not require it to address the claim.

75.     In Mr. Flowers' second trial, Evans again attempted to strike all five Black prospective jurors in the jury pool. The trial court ruled that Evans' fifth attempted strike had been

---

[18] *See id.* at 10; *see also* Will Craft, *Mississippi D.A. has long history of striking many blacks from juries*, APM Reports, June 12, 2018, https://features.apmreports.org/in-the-dark/mississippi-district-attorney-striking-blacks-from-juries/ (last viewed Nov. 7, 2019).

motivated by race and that Evans's proffered, race-neutral reason for the strike—that the juror had been sleeping—was false. The Mississippi Supreme Court also reversed this conviction for prosecutorial misconduct before reaching the *Batson* claim raised on appeal.

76.     Despite the *Batson* finding in Flowers' second trial, Evans used all 15 of his peremptory challenges in the third Flowers trial to strike Black prospective jurors. This time, the Mississippi Supreme Court addressed Flowers' *Batson* claim on appeal. The Court noted that Flowers' appeal presented "as strong a prima facie case of racial discrimination as [it has] ever seen in the context of a Batson challenge."[19] It reversed Flowers' capital murder conviction because Evans "engaged in racially discriminatory practices during the jury selection process."[20]

77.     The Court ruled that Evans' race-neutral reason for striking one juror "was clearly pretextual."[21] It also held that Evans' reason for striking a second Black juror was "equally specious" and added that "there is absolutely no evidence in the record to support the State's proffered reason for striking her."[22] Finally, the Court ruled that three of Evans' other strikes against Black jurors were "also suspect."[23]

78.     These adverse *Batson* rulings did not change the jury selection practices of Evans' office or convince Evans to stop discriminating against Black jurors.

79.     In Mr. Flowers' fourth trial, Evans proceeded to use all eleven of his peremptory challenges to strike Black jurors. The jury hung, and the trial judge declared a mistrial.

80.     The record from Flowers' fifth trial did not include race information for the prospective jurors. This trial also ended in a mistrial after the jury failed to agree upon a verdict.

---

[19] *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007).
[20] *Id.* at 939.
[21] *Id.* at 936.
[22] *Id.*
[23] *Id.*

81.     In Mr. Flowers' sixth trial, Evans accepted one Black juror and struck the remaining five. The jury convicted him, and a divided Mississippi Supreme Court affirmed his conviction.

82.     In June 2019, the United States Supreme Court reversed that conviction because it found that Evans had discriminated again when selecting jurors. As Justice Kavanaugh explained for the Court, Evans approached jury selection in Mr. Flowers' trials "as if *Batson* had never been decided."[24] Evans pursued a "blatant pattern of striking black prospective jurors," using his "peremptory challenges to strike 41 of the 42 black prospective jurors that [he] could have struck."[25] Twice noting "the extraordinary facts" before it,[26] the Supreme Court ruled that Evans had violated *Batson* and that Mr. Flowers was due a new trial.[27]

### E.     Evans Has Refused to Accept the Supreme Court's Judgment That His Practice of Jury Selection is Racially Discriminatory.

83.     Evans' policy, custom, or usage of disparately using peremptory strikes to exclude Blacks from jury service persists to this day. The statistical disparity in the cases from 1992 through 2017 is inexplicable on non-racial grounds, and court records from jury selection in the Fifth Circuit Court District since 2017 suggest that the practice continues now. Absent intervention from this Court, Evans will continue to pursue the same discriminatory policy, custom, or usage.

84.     Indeed, as recently as September 5, 2019, Evans told The Winona Times that he disputed the Supreme Court's decision in Flowers, saying "I think it was a ridiculous ruling." He further told the newspaper: "They [the Supreme Court] basically said there was nothing wrong with the case and reversed it anyway."[28]

---

[24] *Flowers v. Mississippi*, 139 S.Ct. 2228, 2246 (2019).
[25] *Id.* at 2235, 2245.
[26] *Id.* at 2235, 2251.
[27] *See id.* at 2251.
[28] Amanda Sexton Ferguson, *Flowers case sent back to circuit court*, THE WINONA TIMES, Sept. 5, 2019 at 2, archived at https://www.flipsnack.com/winonatimes/win0905/full-view.html (last visited Nov. 7, 2019).

85.     In the absence of intervention by this Court, Evans will ignore the Supreme Court's decision and continue his office's policy, custom, and usage of racial discrimination in the use of peremptory challenges—not just in Curtis Flowers' case, but in every case in the Fifth Circuit Court District in which Black citizens appear for jury service.

## CLAIM FOR RELIEF

86.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 85 above.

87.     In his official capacity as District Attorney, Doug Evans has employed—and will continue to employ—a policy, custom, and/or usage of exercising peremptory challenges to strike prospective Black jurors because of their race, in violation of the Fourteenth Amendment to the United States Constitution. Evans exercises these discriminatory strikes while acting under color of state law, and his conduct deprives Black citizens of "the rights, privileges, or immunities secured by the Constitution and laws."

88.     Plaintiffs are entitled to a declaratory judgment that Evans' policy, custom, and/or usage as alleged above violates the constitutional rights of the Plaintiffs and of all similarly situated persons.

89.     Plaintiffs are also entitled to injunctive relief that ensures that Defendant Evans ceases this unconstitutional policy, custom, and/or usage.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A. Certify this action as a class action on behalf of Black citizens who are eligible to serve on criminal trial juries in the Fifth Circuit Court District of Mississippi.

B. Declare that the Defendant's custom, usage, and/or policy described in the complaint violate the Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution.

C. Issue a permanent injunction forbidding the Defendant and his agents, employees, and successors in office from maintaining a custom, usage, and/or policy of exercising peremptory challenges against prospective Black jurors because of their race.

D. Award reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

E. Grant such other relief as may be just and reasonable.

Respectfully submitted,

/s/ James Craig
James Craig, MS Bar No. 7798
Emily Washington*
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org


/s/ Christopher Kemmitt
Christopher Kemmitt*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street, NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (202) 682-1312
ckemmitt@naacpldf.org

Liliana Zaragoza*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
lzaragoza@naacpldf.org

*Pro Hac Vice Motions Forthcoming