**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**ATTALA COUNTY, MISSISSIPPI,**
**BRANCH OF THE NAACP, ANTONIO**
**RILEY, SHARON N. YOUNG, CHARLES**
**HAMPTON, and RUTH ROBBINS**                                    **PLAINTIFFS**

**VS.**                                         **CIVIL ACTION NO. 4:19-CV-167-DMB-JMV**

**DOUG EVANS, IN HIS OFFICIAL**
**CAPACITY AS DISTRICT ATTORNEY**
**OF THE FIFTH CIRCUIT COURT**
**DISTRICT OF MISSISSIPPI**                                       **DEFENDANT**

---

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, OR IN THE ALTENRATIVE, ABSTENTION

Doug Evans, in his official capacity as the District Attorney for the Fifth Circuit Court District of Mississippi ("District Attorney" or "Mr. Evans"), files this memorandum in support of his motion to dismiss the Class Action Complaint for Declaratory Judgment and Injunctive Relief ("Complaint").

### INTRODUCTION

Plaintiffs request the extraordinary remedy of a permanent injunction prohibiting the District Attorney, and even more broadly, the entire District Attorney's Office for the Fifth Circuit Court District of Mississippi ("Fifth District"), from engaging in what they allege is a policy, custom or usage of discriminatorily striking African-American prospective jurors using peremptory challenges in future state criminal trials. *Compl.*, ¶¶ 14, 87.

Plaintiffs also seek a declaration that the District Attorney's "custom and usage, and/or policy described in the complaint violate the Fourteenth Amendment of the United States Constitution." *Id.*, ¶ B. Plaintiffs requested relief would require this Court to intervene and to oversee and adjudicate the discretionary future conduct of the District Attorney in criminal trials – and more specifically – jury

selection. While Plaintiffs stop short of seeking an absolute ban on the District Attorney's use of peremptory challenges against African-American prospective jurors in future state criminal trials, the practical effect of such an injunction is the same. This is because neither the District Attorney nor the attorneys in the Fifth District's office would know whether a particular future peremptory challenge would be subject to later federal review by this Court under an injunctive order.

As an initial matter, the type of vague and overbroad injunctive relief would violate Rule 65(d)(1)(C) of the Federal Rules of Civil Procure requiring injunctions to "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." *Id.;* s*ee also Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) ("The rule embodies the elementary due process requirement of notice"). Further, Plaintiffs seek not only to prohibit the <u>current</u> District Attorney from using peremptory challenges in the manner alleged in the Complaint, but also his <u>successors</u> in office. *Id.*, p. 22, *Prayer for Relief*, ¶ C.

At its core, the Complaint suffers from three fundamental, and ultimately, fatal flaws. As a threshold matter, Plaintiffs do not have Article III standing as they do not have an injury-in-fact. To satisfy Article III, an injury must be "'concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 560 (1992)) (some internal question marks omitted). A future injury must also be "'certainly impending,' or there must be a 'substantial risk' that the harm will occur." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Second, and closely related to standing, Plaintiffs' claims are not ripe. Like Article III's standing requirements, the justiciability doctrine of ripeness "'originate[s] in Article III's 'case' or 'controversy' language. . ..'" *Choice Inc. of Texas v. Greenstein*, 710, 715 (5th Cir. 2012) (citation omitted). The ripeness doctrine is "also drawn 'from prudential reasons for refusing to exercise

jurisdiction."'" *Id.* at 715 (citations omitted). Ripeness is also intended to "prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. . ..'" *Id.* Plaintiffs' claims they may be subjected to a peremptory strike based on race in the future are not ripe.

Finally, even assuming *arguendo* the individual Plaintiffs have standing and their claims are ripe, the Court should abstain because the prospective equitable relief sought constitutes nothing short a permanent, ongoing, and deeply fact-intensive "federal audit of state criminal proceedings" in the Fifth District – the very type of federal court intrusion the Supreme Court has said would be "antipathetic to the established principles of comity." *O'Shea v. Littleton*, 414 U.S. 468, 501 (1974).

Under these circumstances, the Court should abstain because the relief sought "opens the door to ongoing federal court intrusion into the operation of state criminal proceedings." *Pickens v. Stewart*, 2019 WL 1442218, at *10 (W.D. La. April 1, 2019). Instead, as *O'Shea* counsels, the "object is to 'sustain [t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 500 (citation omitted). The relief sought by Plaintiffs does not sustain this "special delicacy" and the Court should abstain.

## FACTS

The Complaint was filed by the Attala County, Mississippi Branch of the NAACP ("Attala NAACP") on behalf of its members, as well as four individuals, Antonio Riley ("Mr. Riley"), Sharon N. Young ("Ms. Young"), Charles Hampton ("Mr. Hampton"), and Ruth Robbins ("Ms. Robins") (collectively "Individual Plaintiffs"). *Compl.*, [Dkt. 1]. Plaintiffs seek permanent injunctive relief against Mr. Evans, in his official capacity as the District Attorney of the Fifth District, and the attorneys in the Fifth District's office, from exercising peremptory challenges to strike prospective African-American jurors because of their race. *Compl.*, p. 1.

According to the Complaint, the individual Plaintiffs reside in three of the seven counties comprising the Fifth District.[1] *Compl.*, ¶¶ 17, 19, 22, 23. The Attala NAACP sues in an associational capacity. *Id.*, ¶ 16. The individual Plaintiffs also seek to represent a class of individuals in the Fifth District who are eligible for jury service and who allegedly face an imminent threat of being denied an opportunity for jury service by a policy, custom, or usage of striking African-American prospective jurors because of their race. *Id.* ¶ 29.

### *Individual Plaintiffs*

- Mr. Riley is an African-American citizen of the United States and Mississippi, who lives in Attala Count, Mississippi. *Compl.*, ¶ 17. Mr. Riley alleges he is a registered voter and has lived in Attala County for more than one year, is over the age of 21, and otherwise qualified to serve as a juror. *Id.*

- Ms. Young is an African-American citizen of the United States and Mississippi and lives in Grenada County, Mississippi. *Compl.*, ¶ 19. Ms. Young alleges she is a registered voter and has lived in Grenada County for more than one year and is over the age of 21 and otherwise qualified to serve as a juror. *Id.* Ms. Young alleges that in 2004 she was then a resident of Montgomery County, Mississippi, was part of the jury pool for Curtis Flowers' third murder trial and that Mr. Evans used a peremptory challenge against her. *Compl.*, ¶ 20.

- Mr. Hampton is an African-American citizen of the United States and Mississippi and lives in Winston County, Mississippi. *Compl.*, ¶ 22. Mr. Hampton alleges he is a registered voter who has lived in Winston County, Mississippi for more than one year, is over the age of 21 and is otherwise qualified to serve as a juror. *Id.*

- Ms. Robbins is an African-American citizen of the United States and Mississippi who lives in Winston County, Mississippi. *Compl.*, ¶ 23. Ms. Robbins alleges she is a registered voter who has lived in Winston County, Mississippi for more than one year, is over the age of 21, and otherwise qualified to serve as a juror. *Id.*, ¶ 23.

### *Associational Plaintiff*

- The Attala County NAACP states it is a county branch of the Mississippi State Conference of the NAACP and brings the suit as on behalf of its members, who are African-American citizens of Attala County, and are qualified for jury service in the Circuit Court. *Compl.*, ¶¶ 15-16.

---

[1] Attala, Carroll, Choctaw, Grenada, Montgomery, Webster, and Winston Counties.

4

### ***Class Plaintiffs***

- Plaintiffs seek to represent a class comprised of African-American citizens who are eligible for jury service in Mississippi's Fifth Circuit Court District. *Compl.*, ¶ 29.

Plaintiffs maintain that in the absence of injunctive relief, the District Attorney will continue to employ an alleged policy, custom, and/or usage of exercising peremptory challenges to strike prospective African-American prospective jurors because of their race, in violation of the Fourteenth Amendment. *Compl.*, ¶ 87. Plaintiffs request an injunction "that ensures that Defendant Evans ceases this unconstitutional policy, custom, and/or usage. *Compl.*, ¶ 89. Plaintiffs pursue a declaratory judgment that District Attorney's alleged policy, custom, and/or usage of peremptory challenges violates their rights and of all similarly situated persons. *Compl.*, ¶ 88.

## LAW AND ARGUMENT

### I. Standard of Review

#### A. Standing

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party invoking the jurisdiction of the federal court bears the burden of demonstrating its existence. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A federal court should consider a Rule 12(b)(1) jurisdictional attack before addressing an attack on the merits. *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 688 F.3d 281, 286 (5th Cir. 2012). A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on the complaint alone, the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

## B.    Abstention

There is some question whether abstention should be considered under Rule 12(b)(1).[2]  In large

measure, the decision turns on the type of abstention at issue.  In *Weekly v. Morrow*, 204 F.3d 613, 614-

15 (5th Cir. 2000), the Fifth Circuit said, "[f]ederal courts do not abstain on *Younger* grounds because

they lack jurisdiction; rather, *Younger* abstention reflects a court's prudential decision not to exercise

[equity] jurisdiction which it in fact possesses."  *Id.* at 614-15 (internal quotation marks omitted).

In *Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 921-22 (5th Cir. 1993), the Court

concluded that, "[b]ecause the abstention doctrines are not exceptions to the federal courts' jurisdiction,

but are rather judicially created guidelines defining circumstances in which courts may decline to

exercise jurisdiction we could not sustain the district court's 12(b)(1) dismissal on their authority; a

determination that abstention is warranted would merely allow us to reach a comparable disposition

on other grounds."  *Id.* at 921-22 (internal citation omitted).

The Court in *Dent* also said, "[t]he appropriate disposition would depend in part on what type

of abstention were deemed applicable.  Whereas *Pullman* abstention contemplates merely the

postponement of the exercise of federal jurisdiction, . . ., *Burford* rests on the premise that any

intervention by a federal court would impermissibly disrupt state regulation, and thus counsels

dismissal.  *Id.* at n.5 (internal citation omitted).  Like *Burford*, abstention under *O'Shea v. Littleton* is

based on similar considerations that intervention by the federal court would impermissibly disrupt state

court criminal proceedings, and warrants dismissal.

---

[2] *Compare, M.D. v. Perry*, 799 F. Supp. 2d 712, 715 n.2 (S.D. Tex. 2011).  The district court in *Perry* noted that, "[n]evertheless, '*Younger* abstention is 'often raised through a Rule 12(b)(1) motion,' *5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure*, § 1350 at 96–100. . ..'"  *Id.*  The *Perry* Court said, "[t]his is also consistent with recent practice in this District."  *Id.*  (Citations omitted).  "A motion to dismiss based on *Colorado River* is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure."  *Pike Co., Inc. v. Universal Concrete Prod., Inc.*, 284 F. Supp.3d 376, 384–85 (W.D.N.Y. 2018); *Stahl York Ave. Co., LLC v. City of New York*, 2015 WL 2445071, at \*7 (S.D.N.Y. May 21, 2015).

## II.     Peremptory Challenges After *Batson*

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89.  A defendant can make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial.  *Batson*, 476 U.S. at 94.  If a prima facie case of racial discrimination has been established, the prosecutor must then provide race-neutral reasons for challenging the African-American prospective jurors.  *Id.* at 97.

In meeting this burden, the State cannot rely on general assertions that its officials did not discriminate or that they properly performed their official duties.  *Id.* at 97 (citation omitted).  The *Batson* Court explained, the prosecutor must demonstrate "permissible racially neutral selection criteria and procedures have produced the monochromatic result."  *Id.*  The trial court then must determine whether the defendant has established purposeful discrimination.  *Id.* at 98.

"The analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges *without substantial disruption of the jury selection process*."  *Hernandez v. New York*, 500 U.S. 352, 358 (1991) (emphasis supplied).  Given the fact-intensive nature of *Batson* challenges, and that the "trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."  *Batson*, 476 U.S., at 98, n. 21; *see also Higgins v. Cain*, 720 F.3d 255, 266 (5th Cir. 2013) ("[P]roof of a prima facie case is fact-intensive . . .").  *Id.*

Five years after *Batson* in *Powers v. Ohio*, 499 U.S. 400 (1991), the Supreme Court held that a "defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by

the prosecution because of their race." *Id.* Post-*Powers*, the Equal Protection framework applies regardless of whether the defendant in the criminal case and the excluded jurors share the same race. *Id.* As one justification for allowing the defendant to raise the third-party equal protection claims of excluded jurors, the Court in *Powers* said that challenges by excluded jurors "are rare." *Id.* at 414.

*Powers* reasoned, "excluded jurors [cannot] easily obtain declaratory and injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges." *Id.* The Supreme Court distinguished exclusion of prospective jurors through peremptory challenges from the practices of jury clerks and commissioners struck down in *Court in Carter v. Jury Comm'n of Green Cnty.*, 396 U.S. 320 (1970) (invalidating Alabama statute "requiring jury commissioners to select for jury service those persons who are generally reputed to be honest and intelligent and esteemed in community for their integrity, good character and sound judgment").

As the Court in *Powers* explained, "it would be difficult for an individual juror to show the likelihood that discrimination against him at the voir dire state will recur." *Id.* at 415 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105-110 (1983)). The Court was also cognizant that, "[i]t remains for trial courts to develop rules, *without unnecessary disruption of the jury selection process*, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice." *Powers*, 499 U.S. at 416 (emphasis supplied).

The Complaint also focuses on the Supreme Court's recent decision in *Flowers v. Mississippi,* 139 S. Ct. 2228 (2019). *Compl.*, ¶¶ 73-82. In *Flowers,* the Supreme Court reversed the Mississippi Supreme Court's decision that the State did not exercise peremptory challenges in a racially discriminatory way in Mr. Flowers's last trial. *Id.* In reversing, the Supreme Court concluded that the trial court clearly erred in concluding the District Attorney's peremptory strike of a prospective juror was not motivated in substantial part by discriminatory intent in violation of *Batson*. *Id.* at 2251.

8

However, *Flowers* does not alter the fundamental conclusion that the relief sought by these Plaintiffs in this case cannot create "the irreducible constitutional minimum of standing" required for Article III. *Lujan*, 504 U.S. at 560. Nor does *Flowers* advance the Plaintiffs' cause given that the nature of the relief sought contravenes "principles of equity, comity, and federalism that must restrain a federal court asked to enjoin a state court proceeding." *O'Shea*, 414 U.S. at 678.

The *Flowers* Court also said, "[i]n reaching that conclusion, we break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case." *Flowers*, 139 S. Ct. at 2251. Therefore, Plaintiffs' request for declaratory and injunctive relief must be viewed, and ultimately resolved, through the prism of Article III's standing and ripeness jurisprudence, and *O'Shea's* respect for comity and federalism – nothing more.

## III.    Article III Standing

### A.    Declaratory and Injunctive Relief

At the outset, "[t]he Judicial Branch may not 'accept for adjudication claims of constitutional violation . . . where the claimant has not suffered cognizable injury.'" *Barber v. Bryant*, 830 F.3d 345 (5th Cir. 2017) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)). Plaintiffs always bear the burden to establish standing. *Barber*, 860 F.3d at 352. The Fifth Circuit recently affirmed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) (citation omitted).

The Fifth Circuit has been clear that because "'[j]urisdiction is power to declare the law,' if we lack jurisdiction, we may not address the merits, but must only 'announc[e] the fact and dismiss[ ] the cause.'" *Hotze v. Burwell*, 784 F.3d 984, 991 (5th Cir. 2015) (quoting *Steel Co. v. Citizens for a Better*

9

*Env't*, 523 U.S. 83, 94 (1998) (emphasis added) (internal quotation marks omitted).  "[The irreducible constitutional minimum of standing contains three elements."  *Lujan*, 504 U.S. at 560.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-601 (internal quotation marks omitted).

In *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019), the Fifth Circuit addressed standing in the context of equitable relief noting that, "injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements."  *Id.*  The *Stringer* Court reiterated that, "[b]ecause injunctive and declaratory relief 'cannot conceivably remedy any past wrong,' plaintiffs seeking injunctive relief can satisfy the redressability requirement *only* by demonstrating a continuing or threatened future, like all injuries supporting Article III standing, must be an injury in fact."  *Id.* at 720 (emphasis supplied) (citation omitted).

The *Stringer* Court framed the analysis in this context that a "threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical."  942 F.3d at 720-21 (internal quotation marks and citations omitted).  The requirement that a future injury be imminent is "'to ensure that the alleged injury is not too speculative for Article III purposes.'"  *Id.* at 721 (quoting *Clapper*, 568 U.S. at 409) (further quoting *Lujan*, 504 U.S. at 564 n.2).

"For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur."  *Id.* at 721 (citing *Susan B. Anthony List*, 573 U.S. at 158) (further citing *Clapper*, 568 U.S. at 414 n.5).  Such alleged future injuries must "proceed with a high

10

degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Lujan*, 504 U.S. at 564 n.2. Therefore, "Article III requires more than theoretical possibilities." *In re Gee*, 941 F.3d at 164.

In *Clapper*, attorneys, human rights, labor, legal and media organizations sought declaratory and injunctive relief regarding possible surveillance Foreign Intelligence Surveillance Act (FISA). *Clapper*, 568 U.S. at 406. Plaintiffs argued that in the course of their work, they often engaged in "sensitive and sometimes privileged telephone and email communications with colleagues, clients, sources, and other individuals located abroad." *Id.* at 406.

Plaintiffs maintained that they communicated by telephone and email with individuals who were likely targets of surveillance under FISA and therefore, their legal communications could be swept up by the surveillance. *Id.* They claimed the injury was fairly traceable the surveillance because there was an "objectively reasonable likelihood that their communications with their foreign contacts will be intercepted . . . at some point in the future." *Id.* at 410.

*Clapper* rejected the "objectively reasonable likelihood standard" as "inconsistent with our requirement that 'threatened injury must be certainly impending to constitute and injury in fact.'" 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (further citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (alleged injury was "'conjectural or hypothetical" because it depended upon how legislators responded to a reduction in revenue); *Ljuan*, 504 U.S. at 565, n.2). The Court in *Clapper* addressed the concept of "imminence" for purposes of a future injury, specifically that the injury must be certainly impending:

> Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.

*Id.* at 409 (emphasis original) (quoting *Lujan*, 504 U.S. at 565, n.2).

11

The *Clapper* Court said the plaintiffs' "theory of standing, which relie[d] on a *highly attenuated chain of possibilities*, does not satisfy the requirement that the injury must be certainly impending." *Id.* at 410 (emphasis supplied) (citation omitted). *See also Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (endangerment can only be imminent if it threatens to occur immediately); *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 519 (5th Cir. 2015) ("[H]ighly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending"); *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (finding as insufficient "the possibility of some remote future injury. A presently existing actual threat must be shown."); *Leal v. Stephens*, 2015 WL 5514021, at *13 (N.D. Tex. Aug. 21, 2015) ("Courts have defined imminent to mean ready to take place, near at hand, impending, hanging threateningly over one's head menacingly near. Black's Law Dictionary defines imminent to mean near at hand; . . . close rather than touching; impending; on the point of happening; threatening; menacing; perilous").

The gravamen of the Complaint is that in the future, Plaintiffs may be subjected to the allegedly unconstitutional use of peremptory strikes by the District Attorney based on their race. *Compl.*, ¶¶ 66-85.[3] The alleged threated future injury, however, is necessarily predicated on a "highly attenuated chain of possibilities" that are not "certainly impending." *Clapper,* 568 U.S. at 409. Given the number of variables regarding Plaintiffs' possible future jury service, it cannot be said any alleged injuries are certainly impending.

Plaintiffs would have to receive a jury summons pursuant to Mississippi Code Annotated § 13-5-28. Then, assuming they receive a jury summons and do not qualify for and invoke the exemptions for jury service under Section 13-5-23, Plaintiffs would have to be impaneled pursuant to Section 13-

---

[3] Plaintiffs cite data collected by American Public Media Reports regarding the historical use of peremptory challenges in the Fifth District since 1992. *Compl.*, ¶¶ 66-72, n.17. These statistics do not bolster Plaintiffs' standing or the ripeness of claims given the number of variables that factor into potential future jury service.

5-65 ("After the drawing of the grand jury, the remaining jurors in attendance shall be impaneled into three petit juries for the first week of court if there be sufficient number . . ."). *Id.*

However, Mississippi Code Annotated §13-5-65 provides that, "[i]f there be more than enough jurors for the three juries . . . the excess may be discharged." *Id.* Thus, Plaintiffs could be excused as a prospective juror before being impaneled for one of the petit juries. Next, if Plaintiffs were to be impaneled, the petit jury would have to be a criminal, not civil, case being prosecuted by District Attorney's Office. Even then, Plaintiffs could be excused for cause.

"'[A] juror who may be removed on challenge for cause is one against whom a cause for challenge exists that would likely [a]ffect his competency or impartiality at trial.'" *Patton v. State*, 248 So.3d 763, 767 (Miss. 2018) (quoting *Evans v. State*, 725 So.2d 613, 653 (Miss. 1997)). The Mississippi Supreme Court has held, "[t]he question of whether a potential juror can be fair and impartial is a judicial question reserved for the trial judge and will not be disturbed unless clearly wrong." *Id.* at 767 (citation omitted).

Assuming Plaintiffs are impaneled and not otherwise stricken for cause, they would then have to be challenged through a peremptory strike. The defendant in the criminal trial would have to assert a *Batson* challenge and make out a prima facie case of discriminatory jury selection. The District Attorney would have to provide a race-neutral reason for challenging Plaintiffs. *Batson*, 476 U.S. at 94-97. The trial court would have to determine whether the defendant has established purposeful discrimination. *Id.* at 98. The trial court would have to deny the *Batson* challenge and find the District Attorney did not exercise his peremptory challenge in a racially discriminatory way, and Plaintiffs are stricken from the jury. This raises a further question. If the trial court denies a *Batson* challenge, can Plaintiffs seek immediate federal relief for alleged racial discrimination? If so, this will place this Court squarely in the position of reviewing the trial court's *Batson* decision.

13

Under these circumstances, "a beneficiary of the injunction could well seek to enforce a federal injunction against a state judge denying a *Batson* challenge in a criminal case, which would separately implicate the concerns which underlie *O'Shea*." *Hall v. Valeska*, 849 F. Supp.2d 1332, 1339 (M.D. Ala. 2012), *aff'd*, 509 F. App'x 834 (11th Cir. 2012). In this regard *Hall* cautioned that, "[a] ruling by this court, even after the completion of the criminal case, which was contrary to the state court judge's ruling on a *Batson* challenge could also have implications for the state court criminal conviction." *Id.*

### B.      The Individual Plaintiffs Lack Standing

As the Supreme Court said in *Spokeo, Inc. v. Robins*, "this case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (quoting *Citizens for Better Environment*, 523 U.S. at 103). And as the Fifth Circuit in *Stringer* said, "injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements." 942 F.3d at 720. Plaintiffs do not allege and cannot demonstrate a current or ongoing injury-in-fact. Instead, Plaintiffs claim they will suffer a future injury by being subjected to allegedly discriminatory treatment by the District Attorney through peremptory challenges in future state criminal trials.

Plaintiffs attempt to fortify the likelihood of their alleged future injury by using census data from the Fifth District. *Compl.*, ¶¶ 18, 21, 24.[4] Plaintiffs state that in 2017, Attala County had a population of 13, 260 persons over age 21. *Id.*, ¶ 18. According to the Complaint, in November 2018, 72.9 percent of adult Mississippians were registered to vote. *Id.* Plaintiffs state that, "it is reasonable to conclude that there are approximately 9,660 registered voters over age 21 in the Attala County." *Id.* Relying on two four-week Terms of Circuit Court per year, Plaintiffs state the Circuit Clerk sends jury summonses to approximately 1,650 persons each year. *Id.*

_____

[4] Plaintiffs cite the United Stated Census Bureau's 2017 American Community Survey (ACS). Compl., ¶ 18.

14

The number of jury summonses represents seventeen percent (17%) of the registered voters in Attala County. According to the same 2017 ACS data, Attala County had an African-American population of 8,027, forty-three percent (43%) of the County's total population. Assuming 1,650 jury summonses are sent each year, it is reasonable to conclude approximately 710 summonses are sent to African-Americans in Attala County. This represents seven percent (7%) of the total registered voters.

According to the Complaint, Grenada County has a population of 15,413 persons over the age of 21. *Compl.*, ¶ 21. Assuming that 72.9% of adult Mississippians are registered voters, Plaintiffs state that "it is reasonable to conclude that there are approximately 11,235 registered voters over age 21 in Grenada County. *Id.* Relying on Grenada County's two four-week terms of Circuit Court per year, Plaintiffs indicate the Circuit Clerk sends out approximately 1,600 summonses. *Id.* This represents fourteen percent (14%) of the registered voters over age 21 in Grenada County. According to the 2017 ACS data, Grenada County's African-American population was 9,250, forty-three percent (43%) of the County's total population. Assuming 1,600 jury summonses are sent each year, it is reasonable to conclude that approximately 688 summonses are sent to African-Americans, or six percent (6%) of the registered voters in Grenada County.

Finally, the Complaint alleges that Winston County had 10,055 registered voters over age 21 in 2017. Using two four-week Circuit Court terms per year, Plaintiffs state the Circuit Clerk sends jury summonses to approximately 1,500 persons. *Compl.*, ¶ 24. This represents fifteen percent (15%) of registered voters over age 21 in Winston County. Based on the 2017 ACS, Winston County's African-American population was 8,742, forty-seven percent (47%) of the county's total population. Assuming 1,500 jury summonses are sent each year, it is reasonable to conclude that approximately 705 are sent to African-Americans, or seven percent (7%) of the total registered voters in Winston County.

Statistically, the individual Plaintiffs thus have between only a six percent (6%) and seven percent (7%) chance in any particular year of even receiving a jury summons. This does not account for the variables that impact whether a prospective juror is impaneled on a criminal jury and possibly subjected to a peremptory challenge based on race. In the end, the statistical possibility that Plaintiffs may receive a jury summons, in and of itself, does not establish a substantial likelihood of a future injury that comports with *Clapper's* mandate that the "threatened injury must be certainly impending to constitute injury in fact." *Clapper*, 568 U.S. at 409.

The Fifth Circuit in *Stringer* rejected generalized census data as a means of demonstrating the likelihood of a future injury. In *Stringer*, Plaintiffs argued they had demonstrated a substantial risk "that they [would] suffer a future injury as a result of the DPS System's noncompliance with the NVRA and the Equal Protection Clause." *Stringer*, 942 F.3d at 721-22. The Court said, "they must demonstrate a 'sufficient probability that each Plaintiff will use the noncompliant driver's license services again.'" *Id.* at 722. Plaintiffs first proffered there was a substantial risk they would move again and be subjected to the noncompliant driver's license service in the future. *Id.* Second, they relied on "Census Bureau data showing that Americans can expect to move 11.7 times in their lifetimes." *Id.*

The Court rejected this statistical approach for demonstrating a future injury stating. "This general data also does not establish a substantial risk that *Plaintiffs themselves* will move again; Plaintiff-specific evidence is needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans." *Id.* at 722 (emphasis supplied) (citation omitted). In this case, although Plaintiffs' data does not actually demonstrate a future injury is certainly impending, this demographic data does not

generally establish that they will be impaneled as a prospective juror in a future criminal trial and subjected to a peremptory challenge improperly motivated by race.

With respect to injury, Plaintiffs also refer to the stigmatic injury that excluded jurors may suffer. *Compl.*, ¶ 43. To be sure, the Supreme Court has held "[a] venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character." *Powers*, 499 U.S at 414-15. However, stigmatic injury "'accords a basis for standing, it is only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]'" *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 468 (2017) (citations omitted). In *Moore*, the Court, rejected a plaintiffs generalized claim of stigmatic injury and reiterated that, "to plead stigmatic-injury standing, Plaintiff must plead that he was *personally subjected to discriminatory treatment*." *Id.* (emphasis supplied) (citation omitted).

Plaintiffs make no cognizable claims in this case that they have been personally subjected to discriminatory treatment. Ms. Young does allege she was a part of the jury pool for Curtis Flowers' third murder trial in 2004, and that she was excluded through a peremptory challenge. *Compl.*, ¶ 20. Ms. Young does not allege that she was personally subjected to discriminatory treatment in 2004. Moreover, while Section 1983 does not prescribe a statute of limitations, "[t]he statute of limitations for a suit brought under Section 1983 is determined by the general statute of limitations governing personal injuries in the forum state." *Piotrowski v. City of Hous.*, 237 F.3d 567, 576 (5th Cir. 2001). Mississippi's statute of limitation for personal injuries is three-years. *See* MISS. CODE ANN. § 15-1-49. Thus, any alleged claim by Ms. Young for personal discriminatory treatment for being stricken from a jury in 2004 based on race is barred by the statute of limitation.

### C. The NAACP Lacks Associational Standing

To have standing, an association or organization must satisfy the well-known requirements of *Lujan*. *See also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (requiring that, for associational standing, the members must independently meet the Article III standing requirements). The Supreme Court has recognized that an association has standing to bring suit on behalf of its members when: (a) *its members would otherwise have standing to sue in their own right*; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 341-43 (1977) (emphasis supplied). Here, the NAACP's members do not have standing to sue in their own right.

### D. The Class Members Lack Standing

While Plaintiffs seek class certification, the Court need not separately address that issue. This is because "a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" *Spokeo*, 136 S. Ct. at 1540 (citation omitted). As the individual Plaintiffs lack standing, the putative class members likewise fail to meet the elements of Article III standing.

## IV. Plaintiffs Claims are not Ripe

Closely related to standing and directly related to Article III's justiciability mandate, Plaintiffs' claims are not ripe. "'A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical.'" *Choice Inc. of Texas*, 691 F.3d 710, 715 (5th Cir. 2012) (citations omitted). "'A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further

18

factual development is required.'" *Id.* at 715 (citation omitted). This case is not ripe because substantial quantum of future factual development is required.

In *Wallace v. Cheeks*, 2013 WL 4519720, at *2 ( S.D. Miss. August 26, 2013), the district court said, "[a] controversy, to be justiciable, must be such that it cannot be presently litigated and decided not on hypothetical, conjectural, conditional or *based upon the possibility of a factual situation that may never develop*." *Id.* (emphasis supplied) (citing *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). Moreover, "[r]ipeness requires that an alleged injury be "'actual or imminent rather than conjectural or hypothetical.'" *Id.* (quoting *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). "'Ripeness is a constitutional prerequisite to the exercise of jurisdiction." *Id.* (quoting *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2008); *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("'A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical'") (citation omitted).

Plaintiffs' claims are not ripe because they necessarily depend upon factual situations that may never develop. *Wallace*, at *2. As set forth, *supra*, Plaintiffs may never receive a jury summons in the Fifth District. If Plaintiffs do receive a jury summons, but there are more than enough jurors in the jury pool, the excess may be discharged from service. Plaintiffs could be excused as a prospective juror before they are impaneled for one of the petit juries. The petit jury for which Plaintiffs are impaneled would have to be a criminal, not civil, case being prosecuted by District Attorney's Office. Plaintiffs could be excused for cause and never be subjected to a peremptory challenge. These events may never occur and the claims are not ripe.

## V.     The Court Should Abstain

Even if Plaintiffs have standing and their claims are ripe, the Court should abstain. Plaintiffs seek a permanent injunction "forbidding the Defendant and his agents, employees, and successors in

office from maintaining a custom, usage, and/or policy of exercising peremptory challenges against prospective [African-American] jurors because of their race." *Compl.*, p. 22, ¶ C. On the face of the Complaint, the relief sought will undoubtedly require this Court to "disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim. . .." *O'Shea*, 414 U.S. at 501.

At its core, this would require this Court intervene in a state court proceeding to adjudicate whether a peremptory challenge has been exercised against Plaintiffs in violation of the Fourteenth Amendment. As the Supreme Court in *O'Shea* said, "[a] federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *Id.* at 500. Nothing could be more intrusive and unworkable that Plaintiffs' sought-after relief.

Like *O'Shea*, Plaintiffs in this case are not seeking to "strike down a single state statute, either on its face or as applied; nor do they seek to enjoin any criminal prosecutions that might be brought under a challenged criminal statute." 414 U. S. at 499. As in *O'Shea*, "[w]hat [plaintiffs] seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 500. And as the *O'Shea* Court explained with respect to this type of federal court intrusion, "the order would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners." *Id.*

The *O'Shea* Court stated that, "[t]his seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." *Id.* at 500. Finally, *O'Shea* cautioned that, "a federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *Id.* The type of relief sought in this case would, no doubt, call for the type of future intervention as to be "intrusive and unworkable." *Id.*

Not only do Plaintiffs' claims fall squarely within *O'Shea's* abstention analytical framework, but this type of challenge is not one of impression. In 2012 in *Hall v. Valeska*, *supra*, African-Americans who had been excluded from jury service through peremptory strikes sought declaratory and injunctive relief alleging the district attorney engaged in a pattern and practice of using peremptory challenges to exclude African-Americans. *Hall*, 849 F. Supp.2d at 1335.

In *Hall*, the Court concluded that, "Plaintiffs have not stated 'an adequate basis for equitable relief' under *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)." *Id.* at 1337. The Court summarized *O'Shea's* application to the declaratory and injunctive relief against the district attorney in these terms:

> Much of the Court's reasoning in *O'Shea* relevant to the nature of the relief sought there also applies to the relief sought in the instant case. The Court in *O'Shea* noted that the plaintiffs did not seek to enjoin criminal prosecutions, *but only specific events which might occur during criminal trials in the future*. The Court explained that the proper balance between federal and state courts requires restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws absent a showing of irreparable injury which is both great and immediate. The Court explained that even though the plaintiffs did not seek to enjoin criminal prosecutions, an order by the federal court would contemplate interruption of state proceedings to adjudicate assertions of noncompliance. The Court explained that such interruption would be an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference *Younger v. Harris*, . . . sought to prevent. The Court reasoned that the injunction would require for its enforcement the continuous supervision by the federal court of criminal proceedings involving any members of the class. The Court further reasoned that, although there was no express requirement in the suggested injunctive relief that the district court supervise the state courts on a day-to-day basis, periodic reporting would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity. The Court also concluded that because an injunction would necessarily allow the beneficiaries of the injunction in the class to have their claims of noncompliance adjudicated in federal court, principles of equitable restraint would be violated.

*Hall*, 849 F. Supp.2d at 1337-38 (emphasis supplied) (internal quotation marks and citations omitted).

The Court noted that, "[a]lthough the Plaintiffs, like those in *O'Shea*, state that they do not seek to enjoin any current or future criminal proceedings, the requested 'intervention,' which allows beneficiaries of the injunction to interfere with state criminal proceedings if there is discrimination in

jury selection, is like the prohibited injunctive relief in *O'Shea*." *Id.* at 1338 (citing *Pompey v. Broward County*, 95 F.3d 1543, 1549 (11th Cir. 1996) (considering the probability that if the injunction were issued, any beneficiary of the injunction "could and probably would seek relief in the federal district court on grounds that the state judge had violated the federal injunction").

*Hall* also concluded that the "practices that the Plaintiffs seek to enjoin, such as disparate questioning of African-American venire members during voir dire, are practices which occur during the course of the criminal trial, and which could be raised there by the criminal defendant as a *Batson* challenge." *Id.* at 1338. Moreover, "[t]he relief sought by the Plaintiffs could also allow any member of the class subjected to a peremptory strike to promptly seek a contempt citation in federal court, so that resort to the federal courts by beneficiaries of the injunction to enforce the injunction would interrupt that process." *Id.*[5] Accordingly, the district court applied *O'Shea* and held plaintiffs failed to state an "appropriate basis for injunctive or declaratory. *Id.* at 1340.

In affirming the district court, the Eleventh Circuit said, "[i]n the light of the teaching of *O'Shea*, the district court did not abuse its discretion when it concluded that the declaratory and injunctive relief sought by Plaintiffs was prohibited. *Hall*, 509 F. App'x at 835. The Eleventh Circuit also explained the ramifications of plaintiffs' requested relief:

> Plaintiffs argue that, because individual jurors are not parties to the criminal proceeding from which they are excluded, enforcement of the injunction would not interfere with individual state criminal cases. Even if that proposition is true, enforcement of the injunction might—as Plaintiffs themselves suggest—involve holding Valeska in

---

[5] The Court in *Hall* noted:

[I]n addition to beneficiaries of the injunction having their claims of noncompliance adjudicated in federal court, the relief requested by the Plaintiffs would allow for beneficiaries of the injunction to seek federal review of state court rulings. *See* (Complaint at p. 18, ¶ (E)(3) (including in reporting requirement the cases in which *Batson* challenges were brought); *id.* at p. 17, ¶ (D) (injunction would be against the Defendants in this case, "as well as those acting in concert and participating with them. . .")).

*Id.* at 1339.

contempt, which would again raise concerns under *O'Shea* and *Younger. See Luckey v. Miller*, 976 F.2d 673, 679 (11th Cir. 1992) (explaining that abstention was appropriate, in part "if, at the end of protracted litigation, a compliance problem arose which would force abstention on the same ground that existed prior to trial.").

509 Fed. App'x at 836. The reasoning of *Hall*, relying on *O'Shea*, applies with equal force to this case.

Earlier this year, the district court in *Pipkins v. Stewart* rejected similar claims for declaratory and injunctive relief to plaintiffs who had been excluded from jury service through peremptory challenges. In *Pipkins*, the plaintiffs sought equitable relief against the District Attorney of Caddo Parish (First Judicial District of Louisiana). As in this case, Plaintiffs alleged the Caddo Parish District Attorney "systematically exercises (and therefore still exercises) peremptory strikes against African-American jurors on the basis of their race for the purpose of empaneling criminal trial juries that are predominately white." *Pipkins*, 2019 WL 144218, at *1.

Plaintiffs in *Pipkins* also relied on demographic data as to the number of qualified African-American jurors in the Parish. *Id.* at *2. Plaintiffs also sought class certification. *Id.*[6] The District

---

[6] With respect to class certification, the district court stated:

If a class were to be certified, how in the world would one determine the real reason why a particular juror was challenged on a particular day in a trial that is past? The question is especially poignant where the trail record does not reflect even a discussion of *Batson v. Kentucky*, 476 U.S. 79 (1986), or *Powers* as to a particular juror. Does it mean that a prosecutor, defense counsel or judge could be deposed in such a suit? Could they be required to disclose internal memos, trial notes or the like to determine (maybe) if there is some extra notation about a particular juror?

Even if a system could be devised to allow for discovery and litigation of the claims, what next? If, in the odd case, a plaintiff is able to make out such a claim, would it mean that a who new method for collateral attack on a final conviction would be thereby created? At stake is the principle, at least given credence sometimes, that the public has a right to see at some point, a defendant in a criminal trial is fully and fairly convicted. *See United States v. Frady*, 456 U.S. 152, 175 (1982). And, what would be the remedy? A 28 U.S.C. § 2254 petition for inadequacy of counsel or some other habeas relief yet undeveloped or unheard of? In our view this is the most serious potential consequence, as it can mean years later an otherwise sustainable prosecution may have to be completely redone because one juror convinced one jury, or judge in the event of a bench trial, that he/she was discriminated against.

*Pipkins*, at *3.

Attorney moved to dismiss on a variety of grounds, including abstention. *Id.* at *3.[7] Like *Hall*, the district court analyzed plaintiffs' claims under *O'Shea*. The district stated that inherent in the injunctive relief sought is the ability of "African-American potential jurors in criminal trials subjected to a District Attorney's peremptory challenge to seek federal review before this Court.[8] *Id.* at *10.

The Court noted that, "[d]uring oral argument, Plaintiffs' counsel attempted to sidestep addressing this inevitability by referring to them as 'entirely salutary, prophylactic measure[s] for the prosecution to follow the Constitution." *Pipkins,* at *10, n.46. Rejecting this argument, the district court said, "[i]t is not the practice of this Court, however, to issue injunctions for which it has no intent or means to enforce. *Id.* Instead, the district court stated it is "required under *O'Shea* 'to consider the 'hypothesized recalcitrance,' and must 'focus on the likely result of an attempt to enforce an order of the nature sought here.'" *Id.* (quoting *Hall*, 849 F. Supp. 2d at 1339 (citation omitted).

The *Pipkins* Court also denied the declaratory judgment stating, "[i]t is difficult to overstate the magnitude of chaos that would ripple out from a federal declaratory judgment that the District Attorney has, and continues to, systematically exercise peremptory strikes in a discriminatory manner on the basis of race. Such a judgment would conceivably call into question most criminal convictions in Caddo Parish dating back to at least the time from which Plaintiffs collected data on juries, but perhaps further." *Id.* at *11. In reaching its conclusion, the district court reiterated the underlying

---

[7] The District Attorney relied on *Younger v. Harris*, 401 U.S. 37 (1971). The district court declined to abstain under *Younger* because there were "no ongoing judicial proceedings in which any of the Plaintiffs is a party." *Pipkins*, at * 7. Applying *O'Shea*, the district court said, "[i]n some circumstances, however, it may be necessary to treat [*Younger* and *O'Shea*] as closely related but distinct sources of abstention." *Id.* at *8.

[8] The Court in *Pipkins* said, "[p]laintiffs sought either a preliminary injunction forbidding the District Attorney from exercising any peremptory challenges to strike otherwise qualified African-American jurors from jury service in criminal jury trials, or a permanent injunction forbidding the District Attorney to employ a custom, usage, and/or policy to exercise peremptory challenges against African-American citizens because of their race in order to empanel criminal trial juries that are predominantly white." *Id.* at *10. The Court noted "[i]n particular, these proposed injunctions closely mirror the request in *Hall* for a permanent injunction against the defendants from engaging the discriminatory use of peremptory strikes. *Id.*

principles espoused in *O'Shea* that, "[t]he principles of federalism, comity, and equitable restraint exist in large part to prevent such an outcome." *Id.* The same holds true in this case.

The Fifth Circuit has applied *O'Shea* on several occasions. For instance, in *Ballard v. Wilson*, 856 F.2d 1568 (5th Cir. 1974), a plaintiff sued a municipal judge seeking injunctive relief from enforcement of the city's overtime parking ordinance, and a declaratory judgment as to the constitutionality of that ordinance. *Id.* While abstaining under *Younger* because future relief would be resolved during pending state proceedings, the Fifth Circuit stated:

> We also note that a federal court ruling on the practices and procedures of the municipal court system, as is requested by Ballard, *would require supervisory enforcement of the ruling by the federal courts.* This type of monitoring of state court procedures also offends principles of federalism and was condemned by the Supreme Court in *O'Shea v. Littleton*, 414 U.S. 488, 94 S. Ct. 669, 38 L.Ed.2d 674 (1974).

*Id.* at 1570 (emphasis supplied) (citing *Parker v. Turner*, 626 F.2d 1, 9 (6th Cir. 1980) (holding federal court will not enjoin the challenged practice even where there is no pending state proceeding because the relief sought would require monitoring of judges' conduct). In fact, the *Parker* Court said, "*O'Shea* extends this *near-absolute restraint rule* to situations where the relief sought would interfere with the day-to-day conduct of state trials. *Parker*, 626 F.2d at 8 (emphasis supplied); *compare, ODonnell v. Harris Cty*, 892 F.3d 147 (5th Cir. 2018) ("The injunction sought by ODonnell seeks to impose '*nondiscretionary procedural safeguard*[s]," which will not require federal intrusion into pre-trial decisions on a case-by-case basis.'") (Emphasis supplied).

That same year in *Gardner v. Lucky*, 500 F.2d 712, 715 (5th Cir. 1974), plaintiffs brought a class action seeking declaratory and injunctive relief against two Florida Public Defender Offices. *Id.* at 713. The public defenders had represented plaintiffs during the criminal process. *Id.* Plaintiffs alleged the Public Defenders' "acts, policies, practices, pattern of conduct and custom violated their rights, and to enjoin the Offices from further representation of indigents unless standards, specified in

25

the complaint and alleged to represent minimum standards of constitutional effectiveness, were met." *Id.* at 713. In affirming the dismissal, the Fifth Circuit said, "[i]t is clear from the face of their complaint that our appellants contemplate exactly the sort of intrusive and unworkable supervision of state judicial processes condemned in *O'Shea*." *Id.* at 715.

In *Tarter v. Hury*, 646 F.2d 1010 (5th Cir. 1981), the plaintiff instituted "broad challenges to the administration of the criminal justice system in Galveston County, Texas" including an excessive bail claim. *Id.* at 1011. The Court, applying *O'Shea*, held "[c]onsiderations of comity, as described in *O'Shea v. Littleton* . . ., defeat the claims based on the imposition of excessive bail. *Id.* at 1013. "The enforcement of any remedial order granting the relief requested would require federal courts to interrupt state proceedings to adjudicate allegations of asserted non-compliance with the order." *Id.*

Other Circuit Courts have applied *O'Shea* with respect to interfering with the operation of state court proceedings. *See Disability Rights New York v. New York*, 916 F.3d 129 (2nd Cir. 2019) ("[E]even where no state proceedings are pending, federal courts must abstain where failure to do so would result in 'ongoing federal audit of state criminal proceedings'"); *Kaufman v. Kaye*, 466 F.3d 83, 86 (2nd Cir. 2006) (applying *O'Shea* to state court judicial assignment procedures); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1072 (7th Cir. 2018) (abstaining under *O'Shea* from enjoining Clerk of Circuit Court to release newly filed complaints upon receipt); *Oglala Sioux Tribe v. Flemming*, 904 F.3d 603, 612 (8th Cir. 2018) (abstaining under *O'Shea* as "[t]he relief requested would interfere with state judicial proceedings . . . and failure to comply with district court's injunction would subject state officials to potential sanctions"); *Miles v. Wesley*, 801 F.3d 1060, 1064 (9th Cir. 2015) (abstaining under *O'Shea* from enjoining number of courthouses used for unlawful detainer actions).

Precisely the same intrusive and unworkable supervision would result from Plaintiffs' declaratory and injunctive relief in this case as evidenced in the Prayer for Relief: "Issue a permanent

injunction *forbidding* the Defendant and his agents, employees, and successors in office from maintaining a custom, usage, and/or policy of exercising peremptory challenges against prospective [African-American] jurors because of their race." *Compl.*, p. 22, ¶ C (emphasis supplied). Such an injunction would allow "any member of the class subjected to a peremptory strike to promptly seek a contempt citation in federal court, so that resort to the federal courts by beneficiaries of the injunction to enforce the injunction would interrupt that process." *Hall*, 849 F. Supp.2d at 1340.

It is difficult to imagine how such an injunction could be enforced in future state criminal proceedings given the number of fact-intensive variables inherent in the jury selection process. "[U]nder *Batson*, proof of a prima facie case is fact-intensive, and '[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.'" *Higgins*, 720 F.3d at 266 (citation omitted). Plaintiffs' relief would require this Court to intervene and disrupt future state court criminal trials, and *O'Shea* counsels in favor of abstention.

## **CONCLUSION**

For the reasons set forth, Doug Evans, in his official capacity as the District Attorney for the Fifth Circuit Court District, respectfully requests that the Court dismiss Plaintiffs' Complaint for lack of standing and ripeness, or in the alternative, to abstain.

This the 23rd day of December, 2019.

Respectfully submitted,

DOUG EVANS, in his official capacity as the District Attorney for the Fifth Circuit Court District

BY:   JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI

BY:   */s/ Douglas T. Miracle*
       DOUGLAS T. MIRACLE, MSB # 9648
       SPECIAL ASSISTANT ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-5654
dmira@ago.state.ms.us

## CERTIFICATE OF SERVICE

I, Douglas T. Miracle, Special Assistant Attorney General for the State of Mississippi, do hereby certify that on this date I electronically filed the foregoing document with the Clerk of this Court using the ECF system which transmitted a copy to all counsel of record.

This the 23rd day of December, 2019.

/s/ Douglas T. Miracle
Douglas T. Miracle