**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

ATTALA COUNTY, MISSISSIPPI,
BRANCH OF THE NAACP, ANTONIO
RILEY, SHARON N. YOUNG, CHARLES
HAMPTON, and RUTH ROBBINS,

          Plaintiffs,

    v.

DOUG EVANS, IN HIS OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF
THE FIFTH CIRCUIT COURT DISTRICT
OF MISSISSIPPI,

          Defendant.

Civil Action No. 4:19-CV-167-DMB-JMV

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .......................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 3

I.      PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT EQUAL
PROTECTION CLAIMS AGAINST DEFENDANT .......................................... 3

          A.     Plaintiffs Have Sufficiently Alleged an Injury in Fact. ......................... 5

                   1.     Plaintiffs have alleged a concrete and particularized injury. .................... 5

                   2.     Plaintiffs have alleged actual and/or imminent harm. ............................... 8

                            a.     Plaintiffs' Allegations Regarding Defendant Evans'
Policy, Custom and/or Usage Support a Finding of a
"Substantial Risk" of Future Harm to Plaintiffs. ........................... 8

                            b.     Plaintiffs' Allegations of a Substantial Risk of Future
Harm are Sufficient to Establish an Actual or Imminent
Injury in Fact. ........................................................................... 12

          B.     Traceability. ........................................................................................ 15

          C.     Redressability. ..................................................................................... 16

II.     PLAINTIFFS' CLAIMS ARE RIPE FOR RESOLUTION ............................. 17

III.    THIS COURT SHOULD NOT ABSTAIN FROM THE EXERCISE OF
FEDERAL JURISDICTION .............................................................................. 18

          A.     Abstention Is Inappropriate Under *Carter v. Jury Commission
of Greene County* and *Ciudadanos Unidos de San Juan v. Hidalgo
County Grand Jury Commissioners*, Which Control This Case. ........................ 20

          B.     Abstention Is Not Permitted in This Case Because the Conditions Required
for The Application of *O'Shea v. Littleton* Are Absent. ..................................... 23

                   1.     Plaintiffs' requested relief will not interrupt future state court
proceedings. ............................................................................................ 23

2. The Plaintiffs are not parties to proceedings in Mississippi's Fifth Circuit Court District and therefore have no adequate remedy at law in those proceedings. ................................................................28

C. Declaratory Relief Is Appropriate in This Case. ..................................................29

D. Abstention Is Inappropriate in this Case Because It Is Inconsistent with the Congressional Intent Behind Section 1983. ..........................................31

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Alexander v. DeSoto Cty. Soil and Water Conserv. Dist.*,
  No. 3:15-CV-179-DMB-JMV, 2016 WL 4508254 (N.D. Miss. Aug. 26, 2016) ....................2

*Ambraco, Inc. v. Bossclip B.V.*,
  570 F.3d 233 (5th Cir. 2009) ................................................................................................3

*Amnesty Int'l USA v. Clapper*,
  638 F.3d 118 (2d Cir. 2011) ...............................................................................................13

*Amnesty Int'l USA v. McConnell*,
  646 F. Supp. 2d 633, 634 (S.D.N.Y. 2009) ........................................................................13

*Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*,
  536 F.3d 439 (5th Cir. 2008) ................................................................................................3

*Ballard v. Wilson*,
  856 F.2d 1568 (5th Cir. 1988) ............................................................................................29

*Batson v. Kentucky*,
  476 U.S. 79 (1986) ................................................................................................................6

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ......................................................................................................34, 35

*Carter v. Jury Comm'n of Greene Cty.*,
  396 U.S. 320 (1970) .....................................................................................................*passim*

*Choice Inc. of Texas v. Greenstein*, 691 F.3d 710 (5th Cir. 2012) ............................................17

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ..............................................................................................................7

*Ciudadanos Unidos De San Juan v. Hidalgo Cty. Grand Jury Comm'rs*,
  622 F.2d 807 (5th Cir. 1980) .......................................................................................*passim*

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................13

*Cort v. Ash*,
  422 U.S. 66 (1975) ..............................................................................................................33

*DeSpain v. Johnston*,
  731 F.2d 1171 (5th Cir. 1984) ............................................................................................28

iv

**TABLE OF AUTHORITIES**
(CONTINUED)

<u>**PAGE(S)**</u>

<u>**CASES**</u>

*Felder v. Estelle*,
    693 F.2d 549 (5th Cir. 1982) ............................................................................ 33

*Flowers v. Mississippi*,
    139 S. Ct. 2228 (2019) .................................................................................... 30

*Gardner v. Luckey*,
    500 F.2d 712 (5th Cir. 1974) ............................................................................ 29

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) ................................................................................. 6, 7, 8

*Hall v. Valeska*,
    849 F. Supp. 2d 1332 (M.D. Ala. 2012) ...................................................... 24, 29

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..................................................................................... 4, 11

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ........................................................................................ 33

*Keene Corp. v. United States*,
    508 U.S. 200 (1993) ........................................................................................ 34

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 3, 16

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982) .................................................................. 19, 23, 28, 29

*Miller-el v. Cockrell*,
    537 U.S. 322 (2003) ........................................................................................ 30

*Milliken v. Bradley*,
    418 U.S. 717 (1974) ........................................................................................ 27

*Mitchum v. Foster*,
    407 U.S. 225 (1972) .............................................................. 31, 32, 33, 34

## TABLE OF AUTHORITIES
(CONTINUED)

**PAGE(S)**

**CASES**

*Monroe v. Pape,*
    365 U.S. 167 (1961) ..........................................................................................32

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ...................................................................................18, 19

*Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,*
    508 U.S. 656 (1993) ..............................................................................1, 7, 8, 11

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) .................................................................................*passim*

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) .............................................................................4

*Parker v. Turner,*
    626 F.2d 1 (6th Cir. 1980) ..............................................................................29

Patsy v. Board of Regents,
    457 U.S. 496 (1982) .........................................................................................33

*Pipkins v. Stewart,*
    No. 5:15-cv-2722, 2019 WL 1442218 (W.D. La. Apr. 1, 2019) ........................29

*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
    862 F.3d 445 (5th Cir. 2017) ...........................................................................17

*Powers v. Ohio,*
    499 U.S. 400 (1991) .................................................................................*passim*

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) .............................................................................3

*Sierra Club v. Cedar Point Oil Co. Inc.,*
    73 F.3d 546 (5th Cir. 1996) ...............................................................................4

*Smith v. Texas,*
    311 U.S. 128 (1940) ...........................................................................................5

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283 (5th Cir. 1992) .......................................................................8, 9

vi

# TABLE OF AUTHORITIES
(CONTINUED)

**PAGE(S)**

## CASES

*Spomer v. Littleton,*
  414 U.S. 514 (1974) .................................................................................................25

*Sprint Commc'ns, Inc. v. Jacobs,*
  571 U.S. 69 (2013) ...................................................................................... 18, 19, 28

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ...................................................................................... 20, 26, 31

*Stringer v. Whitley,*
  942 F.3d 715 (5th Cir. 2019) ...........................................................................*passim*

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...................................................................................................4

*Tarter v. Hury,*
  646 F.2d 1010 (5th Cir. 1981) .................................................................................29

*Trevino v. Celanese Corp.,*
  701 F.2d 397 (5th Cir. 1983) ...................................................................................12

*Turner v. Fouche,*
  396 U.S. 346 (1970) .........................................................................................*passim*

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,*
  517 U.S. 544 (1996) ...................................................................................................4

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
  330 U.S. 75 (1947) ...................................................................................................31

*Walker v City of Calhoun,*
  901 F.3d 1245 (11th Cir. 2018) ...............................................................................19

*Wallace v. Cheeks,*
  No. 3:13CV436TSL–JMR, 2013 WL 4519720 (S.D. Miss. Aug. 26, 2013) ........................18

*Younger v. Harris,*
  401 U.S. 37 (1971) ...................................................................................................19

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ...................................................................................... 33, 34, 35

**TABLE OF AUTHORITIES**
(CONTINUED)

**PAGE(S)**

**OTHER AUTHORITIES**

Donald H. Zeigler, *A Reassessment of the* Younger *Doctrine in Light of the
Legislative History of Reconstruction*, 1983 Duke L.J. 987 (1983)................................32, 34

Martin H. Redish, *Abstention, Separation of Powers, and the Limits of the
Judicial Function*, 94 Yale L.J. 71 (1984)...........................................................................33

## PRELIMINARY STATEMENT

This class action lawsuit arises from District Attorney Doug Evans' nearly thirty-year history of denying Plaintiffs and similarly situated persons the equal "opportunity to participate in the democratic process" through "the honor and privilege of jury duty[.]" *Powers v. Ohio*, 499 U.S. 400, 407 (1991). Plaintiffs alleged in their Complaint that Evans' office deprives them of the Fourteenth Amendment's equal protection guarantee by maintaining a longstanding "policy, custom, and/or usage" of disproportionately striking Black prospective jurors with peremptory challenges in order to empanel criminal trial juries that are predominantly white. Compl., ¶¶ 8–10, 61–82, ECF No. 1. Absent injunctive and declaratory relief from this Court, Mr. Evans will continue to deny Plaintiffs and other statutorily eligible Black residents of the Fifth Circuit Court District ("Fifth District") the opportunity to participate in jury service on an "equal footing" to white prospective jurors. *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) [hereinafter *Associated Gen. Contractors of Am.*].

The Supreme Court has said that "individual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf." *Powers*, 499 U.S. at 414 (citing *Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 329–30 (1970)). Mr. Evans' motion fails to acknowledge this fundamental principle, and the arguments advanced in his brief seek to render it meaningless.

Defendant has moved to dismiss this case on three grounds. First, Defendant argues that Plaintiffs' factual allegations do not support a finding of Article III standing, and that this Court therefore does not have jurisdiction to hear the case. Second, Defendant argues that any claims Plaintiffs might have are not yet ripe. Third, Defendant argues that the Court should abstain from hearing this matter pursuant to *O'Shea v. Littleton*, 414 U.S. 488 (1974).

1

None of Defendant's arguments merits dismissal of the instant complaint. Moreover, Defendant's arguments, if accepted, would prevent prospective venire members from challenging jury discrimination in civil actions. Under Defendant's view, equitable relief is categorically unavailable to the victims of jury discrimination because any proposed injunction that would halt such discrimination requires abstention, and any threat of future discrimination is insufficiently imminent to support standing. Because Mr. Evans is protected from a damages suit by absolute prosecutorial immunity, and his office is protected from a damages suit by sovereign immunity, eliminating equitable relief would prevent him from being held accountable by Black jurors. *Powers* acknowledged that, "[a]s a practical matter, . . . these [jury discrimination] challenges are rare[,]" 499 U.S. at 414, but Mr. Evans seeks to make these "rare" challenges extinct. His position is legally untenable and constitutionally repugnant. This Court should reject it.

## STATEMENT OF FACTS

Plaintiffs hereby incorporate the facts set forth in their Complaint as if fully stated herein. "In evaluating subject matter jurisdiction on a motion to dismiss a court may consider [among other things] (1) the complaint alone, [or] (2) the complaint supplemented by undisputed facts evidenced in the record[.]" [1] *Alexander v. DeSoto Cty. Soil and Water Conserv. Dist.*, No. 3:15-CV-179-DMB-JMV, 2016 WL 4508254, at *1 (N.D. Miss. Aug. 26, 2016) (citing *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen Liab. Corp.*, 757 F.3d 481, 483 (5th Cir. 2014)); *see also* Declaration of Antonio Riley (attached hereto as Exhibit 1).

---

[1] A Court may also consider "(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts[,]" however, this prong is inapplicable here, where Defendant has not raised and Plaintiffs have not identified any factual disputes for the Court to resolve at this stage. *DeSoto Cty. Soil and Water Conserv. Dist.*, 2016 WL 4508254, at *1.

**STANDARD OF REVIEW**

On a motion to dismiss pursuant to 12(b)(1), the party asserting jurisdiction "bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). For purposes of Defendant's Rule 12(b)(1) motion, this Court must accept all facts contained in the Complaint as true and construe them in the light most favorable to Plaintiffs. *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009); *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 448–49 (5th Cir. 2008).

**I. PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT EQUAL PROTECTION CLAIMS AGAINST DEFENDANT.**

Individual Plaintiffs Riley, Young, Hampton, and Robbins ("Individual Plaintiffs"), and organizational Plaintiff Attala County, Mississippi NAACP ("Attala County NAACP"), have alleged in their class action Complaint that Defendant Doug Evans, in his official capacity, has deprived and will continue to deprive them of their right to Equal Protection under the law as established by the Fourteenth Amendment.

In order to avail themselves of a federal court's jurisdiction, Plaintiffs must plead factual allegations sufficient to support a finding of Article III standing. Namely, Plaintiffs must allege the existence of (1) "an injury in fact" that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "fairly . . . trace[able] to the challenged action of the defendant"; and (3) "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alteration in original) (citations and internal quotation marks omitted). Defendant argues that Plaintiffs have failed to allege facts sufficient to show their Article III standing to sustain the instant action. The short answer to Defendant's argument was given by the Supreme Court in *Carter*:

> People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion. Surely there is no jurisdictional or procedural bar to an attack upon systematic jury discrimination by way of a civil suit such as the one brought here.

*Carter v. Jury Comm'n of Greene Cty.*, 396 U.S. 320, 329–30.

But individuals are not the only parties who may bring suit on behalf of aggrieved would-be jurors. An organization may also assert standing in one of two ways: organizational standing on its own behalf or associational standing on behalf of its members. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (citations omitted). Associational standing enables an organization to bring suit in a representative capacity when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996). Only the first requirement for associational standing—whether "its members would otherwise have standing to sue in their own right[]"—is at issue here. *Hunt*, 432 U.S. at 343; *see* Def.'s Mem. at 5, 14–18.

To satisfy the first requirement, an association need not establish that a substantial number of its members have suffered an injury; rather, it must only assert that at least one of its members has. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996). Ordinarily, the association must specifically identify at least one affected member, however, it is not required to do so where, as here, "*all* the members of the organization are affected by the challenged activity[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99

4

(2009) (citing *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 459 (1958) (association alleged injury on behalf of all members)) (emphasis in original).

As discussed at greater length below, Plaintiffs have alleged a justiciable actual or imminent harm sufficient to support standing.

### A. Plaintiffs Have Sufficiently Alleged an Injury in Fact.

In order to "invoke the jurisdiction of the federal courts" a plaintiff must meet "two basic constitutional requisites[.]" *Ciudadanos Unidos De San Juan v. Hidalgo Cty. Grand Jury Comm'rs*, 622 F.2d 807, 815 (5th Cir. 1980) [hereinafter *Ciudadanos Unidos*]. First, the injury must be concrete and particularized. That is, a plaintiff must show that "he possesses a legally cognizable interest which gives him a 'personal stake' in the outcome[.]" *Id.* Second, the injury must be actual or imminent—that is, the plaintiff must allege "that the controversy is a 'live' one[.]" *Id.* In cases alleging future harm, "to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). A history of past discrimination supports a finding of future harm. *Ciudadanos Unidos*, 622 F.2d at 823.

For the reasons stated below, Plaintiffs have established an "injury in fact."

### 1. Plaintiffs have alleged a concrete and particularized injury.

"For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it, but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940); *see also Ciudadanos Unidos*, 622 F.2d at 809–10. For this reason, "[o]nce the State chooses to provide grand and petit juries . . . it must hew to federal constitutional criteria in

5

ensuring that the selection of membership is free of racial bias." *Carter*, 396 U.S. at 330; *see also Turner v. Fouche*, 396 U.S. 346, 362 (1970) (recognizing "a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications"); *Ciudadanos Unidos*, 622 F.2d at 815–16 (quoting *Carter*).

While courts have long recognized the right of criminal defendants to challenge the discriminatory exclusion of jurors, the *Carter* Court recognized that "[p]eople excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion." *Carter*, 396 U.S. at 329–30 (citations omitted). The right of excluded jurors to challenge systematic discrimination extends to prosecutors' unconstitutional use of peremptory challenges. The U.S. Supreme Court confirmed in *Batson v. Kentucky* and *Powers v. Ohio* that jurors, as well as criminal defendants, are harmed by prosecutors' use of "peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race[.]" 499 U.S. at 409; *see also Batson v. Kentucky*, 476 U.S. 79, 97 (1986) (recognizing "the Equal Protection Clause . . . forbids the States to strike black veniremen on the assumption that they will be biased in a particular case . . . ."). While "[a]n individual juror does not have a right to sit on any particular petit jury, . . . he or she does possess the right not to be excluded from one on account of race." *Powers*, 499 U.S. at 409.

The harm in this case extends beyond the harm inflicted on individual jurors who have been struck because of their race. Mr. Evans harms or will harm Plaintiffs by utilizing a racially discriminatory jury selection process. As the Supreme Court explained in a different equal protection context, the harm "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (addressing claim of intentional discrimination in college admissions program) (quoting

6

*Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. at 666). For example, "in the context of a challenge to a [contractor] set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Associated Gen. Contractors of Am.*, 508 U.S. at 666 (citation omitted); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) ("The [set-aside program] denies certain citizens the *opportunity to compete* for a fixed percentage of public contracts based solely upon their race.") (emphasis added). In this type of case, the plaintiff "need only demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Associated Gen. Contractors of Am.*, 508 U.S. at 666 (emphasis added). Significantly, the *Associated General Contractors of America* Court relied on a jury discrimination case, *Turner v. Fouche*, for the proposition that the injury complained of is the denial of the "right to be *considered* for public service without the burden of invidiously discriminatory disqualifications." *Id.* (quoting *Turner*, 396 U.S. at 362) (emphasis in original).

In this case, Plaintiffs allege that Defendant denies or will deny to them the opportunity to participate in the jury selection process "on an equal footing" to white prospective jurors. *Id.* The injury does not, as Defendant contends, depend upon Plaintiffs necessarily being struck, just as the injury did not depend upon "the loss of a contract" in *Associated Gen. Contractors of Am.*, 508 U.S. at 666, or *J.A. Croson Co.*, 488 U.S. 469. Rather, the injury complained of is the "imposition of the barrier" to public service—in this case, Mr. Evans' policy, custom, and/or usage of employing peremptory strikes to systematically and intentionally exclude prospective jurors from service based on their race. *Gratz*, 539 U.S. at 261–62; *see also Turner*, 396 U.S. at 362–63.

It is clear that prospective jurors belonging to a group that has been disproportionately excluded from jury service have a "personal stake in the outcome" of a challenge to systematic

7

jury discrimination. *Ciudadanos Unidos*, 622 F.2d at 815; *see also Carter*, 396 U.S. at 329–30; *Powers*, 499 U.S. at 414–15. Plaintiffs do not need to show whether they would have been seated absent Defendant's policy in order to establish a concrete and particularized harm. They need only demonstrate that they are "able and ready" to participate in the jury selection process as prospective jurors and "that a discriminatory policy prevents [them] from doing so on an equal basis." *Associated Gen. Contractors of Am.*, 508 U.S. at 657; *see also Gratz*, 539 U.S. at 262.

As Black eligible voters in the Fifth District who are "able and ready" to serve as venirepersons, Plaintiffs allege that Defendant's policy, custom, and/or usage of disproportionately striking Black prospective jurors serves as a barrier that prevents them, and similarly-situated Black prospective jurors in the Fifth District, from participating as venirepersons on an equal footing with white prospective jurors in the same jurisdiction. Compl., ¶¶ 15–24, 61–85; Ex. 1, Riley Decl. Because there is no colorable dispute regarding whether a concrete or particularized injury would exist for a prospective juror subject to a discriminatory jury selection process, Plaintiffs have sufficiently alleged a concrete and particularized injury.

### 2. *Plaintiffs have alleged actual and/or imminent harm.*

b. Plaintiffs' Allegations Regarding Defendant Evans' Policy, Custom and/or Usage Support a Finding of a "Substantial Risk" of Future Harm to Plaintiffs.

The Fifth Circuit has already explained in no uncertain terms that "members of racial minorities have standing to obtain prospective relief from jury selection systems that are consistently administered so as to exclude them from jury service." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992); *see also Carter*, 396 U.S. 320; *Ciudadanos Unidos*, 622 F.2d 807. Plaintiffs have alleged that Mr. Evans consistently administered a jury selection system so as to exclude African Americans from jury service, and a wealth of evidence supports

that claim. That allegation is sufficient for standing purposes. Mr. Evans' standing argument simply ignores this binding rule of law and pretends that *Ciudadanos Unidos*, *Carter*,[2] and *Society of Separationists, Inc.* were not decided. As a result, his argument must be rejected.

Defendant Evans' past illegal conduct "give[s] rise to a strong inference that the injury will be repeated in the future." *Ciudadanos Unidos*, 622 F.2d at 820. Plaintiffs have alleged that Defendant's policy, custom, and/or usage has existed for nearly thirty years. The publicly available data regarding Mr. Evans' trials spanning 1992 to 2017 shows that, although Black jurors comprised only 35% of the eligible jurors called during that period, 71% of jurors struck were Black. Compl. ¶¶ 66–67. Over 225 trials, Evans' office struck Black prospective jurors 4.4 times more frequently than he struck white jurors. In the 89 trials for which regression analysis could be done "to determine whether the significant disparities between white and Black strike rates could be explained by race-neutral factors[,]" the data "showed that a Black juror faced odds of being struck that were 6.67 times those faced by similarly situated white jurors." Compl. ¶¶ 71–72. Publicly available records bridging the gap between 2017 and 2019 suggest Defendant Evans' "practice continues now." Compl. ¶ 83. Moreover, the strike information available from Curtis Flowers' trials and findings by the Supreme Courts of Mississippi and the United States that Evans' employed peremptory strikes in a discriminatory manner in Flowers' case, Compl. ¶¶ 73–84, all support the reasonable inference that Evans' disproportionate use of peremptory strikes to exclude Black jurors is part of a "jury selection system[] that [is] consistently administered so as to exclude [African Americans] from jury service." *Soc'y of Separationists, Inc.*, 959 F.2d at 1287.

---

[2] Mr. Evans does advert briefly to the Court's decision in *Carter*, but he ignores its relevance to the standing inquiry entirely. *See* Def.'s Mem. at 8.

9

These allegations support the inference that there is "at least a 'substantial risk' that the injury will occur." *Stringer*, 942 F.3d at 721 (citing *Susan B. Anthony List*, 573 U.S. 158 (quoting *Clapper*, 568 U.S. at 414 n.5)). While "allegations of past illegal conduct . . . do not in themselves establish a live controversy[,]" such allegations can "give rise to a strong inference that the injury will be repeated in the future." *Ciudadanos Unidos*, 622 F.2d at 820. When that history of discrimination is paired with a jury selection system that places "ungoverned discretion in the hands of the [district attorney] . . . the threat of future injury is palpable." *Id.* at 820–21.

Moreover, notwithstanding prior court findings by the Supreme Courts of both Mississippi and the United States that Defendant committed prosecutorial misconduct on exactly the basis alleged here, Mr. Evans has indicated his belief that the finding by the U.S. Supreme Court that his office has a history of racial discrimination in the use of peremptory challenges is "ridiculous." Compl. ¶ 84 (citing Amanda Sexton Ferguson, *Flowers case sent back to circuit court*, THE WINONA TIMES, Sept. 5, 2019 at A2, archived at https://www.flipsnack.com/winonatimes/win0905/full-view.html (last visited Jan. 31, 2020) ("I think it was a ridiculous ruling."); *see also* Compl. ¶¶18, 21, 24, 83–85. Given that Mr. Evans has expressed no concern regarding his existing or past practices, this statement supports an inference that there is a substantial risk his custom, policy, and/or usage will continue unchanged.

In this case, the Attala County NAACP has alleged that all—or at least one—of its members have suffered or will suffer harm. *See* Ex. 1, Riley Decl.; *see also supra* Sections I, I.A.1 (discussing associational standing and Plaintiffs' theory of injury in fact). All Attala County NAACP members are statutorily eligible for jury service and are "able and ready" to serve on a jury if called. Thus, they face a "substantial risk" of harm by Defendant Evans' policy. *Stringer*, 942 F.3d at 721 (citing *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414

n.5)). Additionally, as an association of 52 members, the statistical likelihood that at least one of its members will be stricken pursuant to Evans' peremptory challenges is "substantial."[3] Even if Defendant's calculations are correct that Black citizens of Attala County have a 7% chance in any particular year of receiving a jury summons, Def.'s Mem. at 15, it is likely that three to four Attala NAACP members are likely to be summoned to serve on a jury in any given year.[4]

With respect to the individual Plaintiffs, Plaintiffs Riley, Hampton, Robbins, and Young have alleged that they are statutorily eligible for jury service and assert that they are "able and ready" to serve when called. *Associated Gen. Contractors of Am.*, 508 U.S. at 666.[5] Where a plaintiff "is denied *equal consideration* for [public] service . . . on the basis of his membership in

---

[3] Plaintiffs need not make this showing to establish standing because the discriminatory barrier imposed by Mr. Evans' jury selection practices causes the injury; however, even if Mr. Evans is correct that injury accrues only when an individual is subject to a discriminatory strike, Plaintiffs still satisfy their burden.

[4] The Attala County NAACP has also satisfied the second and third requirements for associational standing. "Its mission is to ensure the elimination of racial discrimination in all spheres and to advocate for political, educational, social, legal, and economic equality for all persons, and Black residents in particular." Compl. ¶ 15. The interests the Attala County NAACP "seeks to protect"—the right of its members, as Black prospective jurors, to be free from Evans' racially discriminatory use of peremptory strikes—are not merely germane, but central, to the organization's purpose. *Hunt*, 432 U.S. at 343. Moreover, "[b]ecause the claims stated and the relief sought are class-wide, the individual participation of each injured party is not indispensable to the proper resolution of [this] case[.]" *Ciudadanos Unidos*, 622 F.2d at 819 n.23.

[5] Defendant further contends that *Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019), precludes Plaintiffs' reliance on "census data as a means of demonstrating the likelihood of future injury." Def.'s Mem. at 16. However, *Stringer* is distinguishable. The *Stringer* plaintiffs presented "Census Bureau data showing that Americans can expect to move 11.7 times in their lifetimes[,]" but provided the Court no allegations, declarations, or other information which might show "a substantial risk that Plaintiffs themselves will move again[.]" *Stringer*, 942 F.3d at 722. The Fifth Circuit in that case took issue with plaintiffs' sole reliance on Census data, *without more*, to allege a statistical likelihood of injury. Here, Plaintiffs present Census data to estimate the population of statutorily-eligible Black jurors in the counties in which Plaintiffs reside or operate. That is not an attempt to extrapolate an individual's likelihood of moving residences from national data as in *Stringer*, but instead establishes the estimated number of people subject to Evans' policy, practice, and custom of excluding Black citizens from jury service in criminal cases. Even so, Plaintiffs do not rely on Census data alone. *Stringer* is also distinguishable because the relevant variable in that case—whether a plaintiff will move—varies greatly from individual to individual and is a matter of individual agency. All eligible Black residents in Mississippi's Fifth Judicial District face the same odds of being selected, and their individual decisions do not affect the chances that a court clerk will randomly select them for a venire.

an identifiable group[, he] has suffered a legally cognizable injury." *Ciudadanos Unidos*, 622 F.2d at 819 n.23 (emphasis added); *see id.* (rejecting Defendant-Appellees' argument that plaintiffs "lack[ed] any particularized injury that entitles them to maintain their actions" on this basis).

All of the individual Plaintiffs satisfy this standard. Although Plaintiffs Riley, Hampton, and Robbins have not alleged that Evans struck them in the past, they allege future harm as a result of Evans' policy, custom, and/or usage, which prevents or will prevent them from participating as a venireperson on an equal footing to white prospective jurors. *See supra* Sections I.A.2.a.–b. Plaintiff Young, by contrast, has alleged that Evans employed "all 15 of his peremptory challenges to strike Black jurors," including herself, during Curtis Flowers' third trial. Compl. ¶ 20. While Defendant contends that Young's claims are time-barred, this argument has no merit. Ms. Young's past harm is another data point indicating the existence of a continuing custom, policy, and/or usage and of imminent future injury, both for herself and her co-plaintiffs. *See Ciudadanos Unidos*, 622 F.2d at 820 (noting, although "allegations of past illegal conduct . . . do not in themselves establish a live controversy[,]" such allegations can "give rise to a strong inference that the injury will be repeated in the future."). At a minimum, Ms. Young's allegations "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ." *Trevino v. Celanese Corp.*, 701 F.2d 397, 403 n.7 (5th Cir. 1983).

Plaintiffs' factual allegations are sufficient at this stage to allow the court to make the reasonable inference that there exists a substantial risk that Mr. Evans' policy, custom, and/or usage will deny to Plaintiffs the equal opportunity "to be considered for public service without the burden of invidiously discriminatory qualifications." *Turner*, 396 U.S. 346 at 362.

       c.    <u>Plaintiffs' Allegations of a Substantial Risk of Future Harm are Sufficient to Establish an Actual or Imminent Injury in Fact.</u>

Defendant cites *Clapper* in his contention that Plaintiffs' theory of standing "relie[s] on a highly attenuated chain of possibilities" that cannot sustain a finding of substantial risk of future harm. *See* Def.'s Mot., at 12 (quoting *Clapper*, 568 U.S. at 410). However, *Clapper* is distinguishable for multiple reasons. Moreover, *Turner v. Fouche*, 396 U.S. 346 (1970), confirms that a court may reach the merits of a race discrimination claim challenging a multi-step selection system—in that case a grand jury and school board selection statute—where that system leads to the ultimate underrepresentation of the plaintiff group.

In *Clapper*, the injury depended on many variables and on many actors. The difficulty of assessing the risk of future harm was compounded by the fact that the *Clapper* plaintiffs brought a facial challenge to the Foreign Intelligence Surveillance Act ("FISA") on the day the President signed FISA into law. Complaint, *Amnesty Int'l USA v. McConnell*, No. 1:08-cv-06259-JGK (S.D.N.Y July 10, 2008), ECF No. 1; *see also id.* 646 F. Supp. 2d 633, 634 (S.D.N.Y. 2009), *vacated and remanded sub nom. Amnesty Int'l USA v. Clapper*, 638 F.3d 118 (2d Cir. 2011), rev'd, 568 U.S. 398 (2013). Plaintiffs also failed to allege data or facts indicating that various contingencies had occurred in the past or might occur in the future. Because of these factors, the *Clapper* Court could not find that there was a "substantial risk" of future harm, 568 U.S. at 414 n.5, or that the harm plaintiffs alleged was "certainly impending[,]" *id*. at 509. By contrast, in this case, Plaintiffs have alleged  nearly thirty years of past conduct, statistical data, and Court decisions, which show that those contingencies have occurred for numerous Black prospective jurors in the past, and that there is a "substantial risk" that Plaintiffs will be harmed by Defendant's longstanding policy, custom, and/or usage in the same manner in the future. *Id.* at 414 n.5.

Moreover, as discussed in Section I.A.1., the theory of harm alleged in equal protection cases is not the ultimate denial, but the imposition of the discriminatory barrier. The harm is not

13

dependent on a series of events leading to Plaintiffs necessarily being struck. It is dependent on the "imposition of the barrier" between them and a fair jury selection process—that is, Mr. Evans' policy, custom, and/or usage of unequal treatment. Thus, the instant case is akin to *Ciudadanos Unidos*, where the plaintiffs alleged "an injury that turns on a single contingency: that the [defendants] will act exactly as they have for the past ten years." *Ciudadanos Unidos*, 622 F.2d at 821. And unlike *Clapper* or *O'Shea*, where the prospect of future injury turned on the plaintiffs' violation of valid laws and their being properly charged under those laws, plaintiffs' "injury here depends solely upon the actions of the [Defendant]." *Id.*

The Supreme Court's decision in *Turner v. Fouche*, 396 U.S. 346 (1970), is instructive. In that case, a Black school child and her father brought suit on behalf of all Black residents in their County. The suit challenged the method by which the county school board and juries were selected, arguing that the selection process denied them the equal protection of the laws. The selection process at issue in *Turner* consisted of five steps: the judge of the state superior court appointed a six-member county jury commission, which, in turn, created a jury list from which a grand jury was drawn. *See id.* at 349. The grand jury then selected a county school board of five members. *Id.* Plaintiffs' challenge centered on the fourth and fifth steps in this long process. Notwithstanding the several intervening steps, the court held that the selection process was unconstitutional, where Black people were underrepresented and disproportionately impacted at the stage of the process in which jury commissioners exercised their discretion.[6]

---

[6] The six-member jury commission began to cull the names of 2,152 individuals who were registered to vote in the most recent general election to remove people who had died, had poor health, or was under 21 years of age. 396 U.S. at 357. Critically, at this stage, the jury commission also removed potential grand jurors deemed "unintelligent" or "not upright"—96% of whom were Black. After this culling of the jury list, only 608 persons remained in the grand jury pool, 37% of whom were Black, compared to the County, which was 60% Black. Thereafter, the commissioners drew names by lot to compose a 23-member grand jury, of whom only six were Black. *Id.* at 357–58. The Court relied on this data indicating significant disparities to hold that the selection statute was unconstitutionally applied. *Id.* at 357. The Court stated that,

As in this case, the *Turner* Court found that "the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria." *Id.* at 360. Thus, notwithstanding several intervening steps in the selection process, the plaintiffs in *Turner* had standing[7] to challenge their underrepresentation on the school board and in the grand jury, ultimately obtaining prospective, injunctive relief. The gravamen of the claim in *Turner* was that the selection system as administered by the defendants did and would continue to cause racial disparities as it had in the past.

Here, the significant statistical disparities from 1992 to 2017, and the evidence of disparate strike rates in Curtis Flowers' trials, all "originate[], at least in part, at the one point in the selection process where the [district attorney's office] invoke[s] [its] subjective judgment rather than objective criteria"—at the moment of Defendant's exercise of peremptory strikes. *Id.* Just as the *Turner* Court reached the merits of plaintiffs' challenge to a multi-step selection process resulting in racial disparities, so, too, should this Court.

For the foregoing reasons, Plaintiffs have alleged an injury in fact.

**B.    Traceability.**

Plaintiffs have alleged that Mr. Evans maintains a policy, custom, and/or usage of systematically excluding Black prospective jurors in the Fifth District through his use of peremptory strikes. Plaintiffs allege that the policy, custom, and/or usage has resulted in disparities

---

based on that record, "it [wa]s impossible to say that this purge of [African-Americans] from the roster of potential jurors did not contribute in substantial measure to the ultimate underrepresentation." *Id.* at 359.

[7] Although the *Turner* Court did not explicitly address standing, the Court implicitly recognized Plaintiffs' standing by permitting the action to proceed and eventually ruling for plaintiffs. There, plaintiffs were Black community members who faced barriers to serving on a school board and grand jury as a result of the discriminatory process. At no point did the *Turner* Court engage in an analysis of the statistical likelihood that the plaintiffs in that case would have made it to the grand jury pool or the school board. *If* the *Turner* Court had required the plaintiffs to make that showing, as Defendant urges here, the case would have been dismissed—and it was not.

"established by statistics showing the actual operation of the [jury] selection process over the past [twenty-eight] years[,]" *Ciudadanos Unidos*, 622 F.2d at 812, as well as by numerous Court decisions finding that Mr. Evans committed prosecutorial misconduct, Compl. ¶¶ 61–84. As a result, Plaintiffs have been or will be denied "equal consideration" for jury service on account of their race. *Ciudadanos Unidos*, 622 F.2d at 826. Having alleged that their injuries are due to the "one constant factor" in this case—Mr. Evans' racially discriminatory policy, custom, and/or usage—Plaintiffs have met the traceability requirement for Article III standing. *Id.* at 823.

### C. Redressability.

Plaintiffs have alleged an injury in fact that is directly traceable to Evans' policy, custom, and/or usage, and which is also "likely" to be "redressed by a favorable decision" granting injunctive and declaratory relief. *Lujan*, 504 U.S. at 560–61. Plaintiffs seeking prospective equitable relief "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer*, 942 F.3d at 720. As discussed above, Plaintiffs have done so here. *See supra* Section I.A.2.b. Injunctive relief would remedy the imminent harm by requiring Mr. Evans to halt the discriminatory practice that would have led to the threatened future injury. A declaratory judgment would also redress the injury by establishing that Mr. Evans' past conduct violated the constitution and must cease.

To the extent Defendant argues that Plaintiffs' injuries cannot be redressed because any equitable relief would constitute too great an intrusion upon the States, such arguments are not relevant for standing purposes. *See also infra* Section III (rebutting Defendant's arguments regarding abstention). In *Ciudadanos Unidos*, the Fifth Circuit rejected a similar argument:

> [Defendants'] last contention that no justiciable case or controversy exists is that it will be impossible for the district court to formulate a remedy, even if appellants' claim of discrimination is proven. While . . . we recognize that the formulation of an effective remedy

> may not be an easy matter, this argument seriously underestimates both the equitable powers and duties and the creative imagination of federal district judges in remedying proven constitutional violations.

622 F.2d at 825.

While "the restructuring of the operation of a state institution may be a difficult even demanding duty," such difficulty must give way to remedying violations of the Equal Protection clause of the Fourteenth Amendment. *Id.* at 826. Indeed, "federal courts have "'*not merely the power but the duty* to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future[.]"'" *Id.* at 826 (quoting *Carter*, 396 U.S. at 340 (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965))) (emphasis added).

For the reasons stated above, Plaintiffs have satisfied Article III standing requirements, and the Court has jurisdiction to hear this case.

## II. PLAINTIFFS' CLAIMS ARE RIPE FOR RESOLUTION

Related to their standing argument, Defendant further argues that Plaintiffs' claims against him are not yet ripe for resolution. As Defendant notes, a claim is not ripe for resolution "when the case is abstract or hypothetical." *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (citation omitted). For the reasons stated above, *see supra* Section I.A (discussing injury in fact), Plaintiffs' claims are neither abstract not hypothetical.

"The ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 456–57 (5th Cir. 2017) (quoting *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010)). Here, the Complaint alleges that there are two terms of court per year in each county of the Fifth Circuit Court District, Mr. Evans continues to pursue the same discriminatory jury selection practice that he has pursued for nearly three decades, and Mr. Evans has indicated his

belief that the U.S. Supreme Court's finding that his office has a history of racial discrimination in the use of peremptory challenges is "ridiculous." Compl. ¶¶18, 21, 24, 83–85.

While Defendant is correct that "factual development is required[]" to adjudicate this claim, Def.'s Mem. at 18–19, this has no impact on whether Plaintiffs' claims are ripe. Unlike *Wallace v. Cheeks*, No. 3:13CV436TSL–JMR, 2013 WL 4519720 (S.D. Miss. Aug. 26, 2013), cited by Defendant, the issue here is not that the Court must await facts which may or may not occur in the future. In *Wallace*, the plaintiff was reinstated to the position from which he alleged he had been wrongfully removed, and the supervisors responsible for his removal no longer had authority over him. *Id.* at *2. Under those circumstances, Wallace's original claim was moot, and any fear of future retaliation was not ripe until facts justifying that fear had occurred.

Here, "further factual development" by means of discovery will aid Plaintiffs in establishing an "explanation for the overwhelming percentage of [Black prospective jurors] disqualified" by Defendant Evans. *Turner*, 396 U.S. at 540. Indeed, "[i]f there is a vacuum it is one which the state must fill, by moving in with sufficient evidence to dispel the prima facie case of discrimination." *Id.* at 540–41 (quoting *Avery v. Georgia*, 345 U.S.559,t 562 (1953)).

## III.    THIS COURT SHOULD NOT ABSTAIN FROM THE EXERCISE OF FEDERAL JURISDICTION

As a general matter, federal courts "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution.'" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 358–59 (1989) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). Where jurisdiction exists, the Supreme Court has "cautioned [that] a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). "[O]nly exceptional circumstances . . . justify a federal court's refusal to decide a case

18

in deference to the States.'" *Id*. at 78 (quoting *NOPSI*, 491 U.S. at 368). These "exceptional circumstances" are reflected in the Court's abstention cases, which "have carefully defined . . . the areas in which 'abstention' is permissible . . . ." *NOPSI*, 491 U.S. at 359. When a "suit comes within none of the [established] exceptions," the exercise of jurisdiction is required. *See, e.g.*, *id*. at 373; *Sprint Commc'ns, Inc*., 571 U.S. at 81–82. "[I]n recent Supreme Court cases," "abstention . . . has become disfavored," *Walker v City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018), and the Court has carefully limited its application to "the exceptions" that it has previously identified.

One of these carefully defined exceptions is the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny, *O'Shea v. Littleton*, 414 U.S. 488 (1974). Defendant Evans seeks refuge under this doctrine, claiming that "the relief sought [by Plaintiffs] will undoubtedly require this Court to 'disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim . . . .'" Def.'s Mem. at 20 (citation omitted). Mr. Evans also contends that declaratory relief is inappropriate because it would cause "chaos" and offend the principles of federalism and comity. *Id.* at 24–25. Both contentions are incorrect.

First, Mr. Evans' motion must fail because this case is controlled by *Ciudadanos Unidos*. 622 F.2d 807. In *Ciudadanos Unidos*, the Fifth Circuit considered a similar abstention argument based upon a similar misreading of *O'Shea*. The Court rejected it, ruling that *O'Shea* was inapposite and that plaintiffs could proceed with their class-action challenge to systemic grand-jury discrimination. *See id.* at 830 n.49. *Ciudadanos Unidos* also ruled that "a court has at a minimum an obligation to conduct an inquiry into how the [allegedly discriminatory] system actually operates before concluding that the system is not amenable to equitable relief." *Id.* at 827.

Second, Mr. Evans errs by ignoring two fundamental limits on the exercise of judicial abstention. Specifically, a court may not abstain under *Younger* or *O'Shea* unless the requested

relief would interrupt state judicial proceedings, *and* the federal plaintiffs must possess an adequate opportunity to raise their challenge in the underlying state proceeding. *See, e.g.*, *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) [hereinafter *Middlesex Cty.*]. Here, both prerequisites are absent. The relief sought by Plaintiffs will not interrupt any state court proceedings because they are not seeking and are not entitled to any such relief. Furthermore, Plaintiffs have no opportunity to raise their constitutional challenge in the underlying proceedings because they are not parties to the proceedings in which they will be prospective jurors. These deficiencies both independently bar abstention under *O'Shea* and *Younger*.

Third, declaratory relief is appropriate in this case, and Mr. Evans' arguments to the contrary are without merit. Procedural rules and other stringent limitations on post-conviction challenges ensure that a declaratory judgment would have little effect on criminal convictions, and the Supreme Court has already considered and rejected Mr. Evans' claim that equitable concerns bar the issuance of a declaratory judgment. *See Steffel v. Thompson*, 415 U.S. 452, 466, 471 (1974).

Mr. Evans has asked this Court to dramatically expand the doctrine of abstention articulated in *Younger* and *O'Shea* so that he may continue his discriminatory conduct without fear of federal oversight. His request is squarely foreclosed by binding decisional law, and this Court should reject his efforts to bar the federal courts from adjudicating important federal rights.

### A. Abstention Is Inappropriate Under *Carter v. Jury Commission of Greene County* and *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners*, Which Control This Case.

The Supreme Court's decision in *Carter* and the Fifth Circuit's decision in *Ciudadanos Unidos* hold that federal courts "have not merely the power, but also the duty, to remedy" discriminatory jury selection practices. *Ciudadanos Unidos*, 622 F.2d at 826; *Carter*, 396 U.S. at 340. Both cases demonstrate that abstention is inappropriate under the circumstances here.

20

In *Ciudadanos Unidos*, the Fifth Circuit applied the Supreme Court's decision in *Carter* to reject a challenge based on *Younger* and *O'Shea*. In that case, Plaintiffs brought a class action in federal court alleging the systematic exclusion of Mexican Americans, women, young people, and poor people from grand jury service. *Ciudadanos Unidos*, 622 F.2d at 810. The defendant jury commissioners relied on *O'Shea* to argue, among other things, that it would be practically impossible for the district court to fashion a remedy, and that an injunction would be inappropriate 'based on notions of federalism and comity and derived from cases such as [*Younger*, *O'Shea*, and their progeny].'' *Id.* at 830 n.49. The Court rejected these arguments, holding that the district court should make a determination regarding the merits of plaintiffs' claim before deciding on the propriety of its requested remedy, and that *O'Shea* was inapposite.

Addressing the issue of remedy, the *Ciudadanos Unidos* court stated, "it is generally error in cases like these to order dismissal on the pleadings because the court could not from the outset define an appropriate remedy." *Id.* at 827. As the Fifth Circuit held, where "an unconstitutional result has consistently been produced by the operation of a state institution," the court is obligated—"at a minimum"—to conduct an investigation into the way the system works before determining that equitable relief is not possible. *Id.* "Anything less is an abdication of the court's duty to remedy proven discrimination 'so far as possible.'" *Id.* (quoting *Carter*, 396 U.S. at 340).

The court also cited numerous cases from Alabama and Georgia in which the federal courts "sanctioned equitable relief in similar cases." *Id.* at 826, 826 n.38. The court suggested that by requiring the defendant commissioners to formulate a plan for compliance, which the federal district court would then supervise, and by "requir[ing] that they file reports," the district court could "devise a remedy in keeping with its constitutional duties and limitations." *Id.* at 829. Finally, the court added: "The equitable powers of the federal courts are ample to remedy any

21

constitutional violations proven in the trial of these cases." *Id.* at 829–30.

With respect to abstention, the Fifth Circuit first noted that the problem of racial discrimination could be remedied without "interfer[ing] with judicial proceedings." *Id.* at 829–30, 830 n.49. Because no such interference would result, the relief sought by plaintiffs fell "outside the equitable restraint principle," and *O'Shea* did not apply.[8] *See id.* (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). The court then explained that the Supreme Court's decision in *Carter* "indicates that no such obstacle to federal injunctive relief exists." *Ciudadanos*, 622 F.2d at 830 n.49.

In *Carter*, much like in this case, African American residents of Greene County, Alabama, brought a class action against officials in the county court system, alleging discriminatory exclusion from grand and petit juries. *Carter*, 396 U.S. at 321–22, 90 S. Ct. at 519. The Supreme Court stated, "[t]he district court found no barrier to such a suit, and neither do we . . . . Surely there is no jurisdictional or procedural bar to an attack upon systematic jury discrimination by way of a civil suit such as the one brought here." 396 U.S. at 329–30 (emphasis added).

As *Ciudadanos Unidos* explained, *Carter* "succinctly and definitively rejected the notion that there were any barriers to injunctive relief in a civil suit such as that before it." *Ciudadanos Unidos*, 622 F.2d at 830 n.49. By reaffirming *Carter* following the decisions in *O'Shea* and *Younger*, *Ciudadanos Unidos* made clear that it remains binding law. Consequently, *Ciudadanos Unidos* and *Carter* are binding on this Court for the proposition that abstention does not bar a suit brought by Black prospective jurors challenging Mr. Evan's policy, practice, custom, and/or usage of engaging in racial discrimination in jury selection.

---

[8] In *Ciudadanos Unidos*, no such interference would occur because its relief was "directed to a time prior to the initiation of actual judicial proceedings." *Id.* Like *Ciudadanos Unidos*, the relief requested in this case would not interrupt any judicial proceedings so *O'Shea* is similarly inapplicable. *See supra* at 23–28.

**B.** **Abstention Is Not Permitted in This Case Because the Conditions Required for The Application of *O'Shea V. Littleton* Are Absent**.

Even if *Ciudadanos Unidos* had not been decided, *Younger*, *O'Shea*, and *Middlesex County* independently demonstrate that abstention is both unwarranted and impermissible in this case. The Supreme Court has narrowly constrained *Younger* abstention to situations where all three of the following conditions are met: (1) the federal action will interrupt a state judicial proceeding;[9] (2) the action implicates important state interests; and (3) the federal plaintiffs have an adequate opportunity in the state proceeding to raise their constitutional challenges. *Middlesex Cty.*, 457 U.S. at 432. Because conditions (1) and (3) are both absent here, abstention is impermissible.

First, Plaintiffs' requested relief will not and could not interrupt any state court proceedings because Plaintiffs are not a party to any such proceedings, and the relief requested—the cessation of an unconstitutional policy, custom, and/or usage by the District Attorney's Office—does not permit or require this Court to interrupt any state court proceedings. Furthermore, injunctions are inherently flexible tools, and this Court can draft and enforce any injunction that results from this suit in a manner that avoids the interruption of state court proceedings. Second, *O'Shea* and *Younger* apply only where Plaintiffs possess an adequate remedy at law in the underlying state proceeding. Here, plaintiffs have no adequate remedy because they are not parties to any state-court proceeding involving Mr. Evans' use of peremptory challenges.

**1.** ***Plaintiffs' requested relief will not interrupt future state court proceedings.***

Abstention is inappropriate in this case because plaintiffs' requested injunction will not interrupt any pending criminal prosecutions. The Supreme Court held that abstention was

---

[9] In cases governed directly by *Younger*, the judicial proceeding must be "ongoing." *See Middlesex Cty.*, 457 U.S. at 432. *O'Shea* extended *Younger* to circumstances where the federal action would cause the "interruption of state proceedings" at a future time. *See O'Shea*, 414 U.S. at 500–02.

23

appropriate in *O'Shea* for the same reason that it did in *Younger*: because plaintiffs requested an injunction in federal court that would restrain prosecutions in state court. *See O'Shea*, 414 U.S. at 500 (explaining that abstention was appropriate to avoid "unwarranted anticipatory interference in the state criminal process *by means of continuous or piecemeal interruptions* of the state proceedings by litigation in the federal courts") (emphasis added); *see also id.* (explaining that requested injunction "would indirectly accomplish the kind of interference that *Younger v. Harris* . . . sought to prevent"). This concern was also the justification for abstention in *Hall v. Valeska*, 849 F. Supp. 2d 1332, 1335–36 (M.D. Ala. 2012), *aff'd*, 509 F. App'x 834 (11th Cir. 2012).[10]

Thus, it is unsurprising that Mr. Evans' abstention argument can be distilled to one essential point: abstention is required because "Plaintiffs' relief would require this court to intervene and disrupt future state court criminal trials" in violation of *O'Shea*. Def.'s Mem. at 27; *see also id.* at 20. Mr. Evans repeats this assertion at some length but makes no effort to explain *why* the interruption of state criminal trials follows inexorably from plaintiffs' requested relief. Whatever the unstated rationale may be, it is incorrect.

Before examining the injunction in this case, it is worth explaining why the injunction in *O'Shea* is different than the injunction requested here. The differences between the two injunctions explain the presence of interruptions in *O'Shea* and the absence of interruptions in this case. Yet Mr. Evans' motion to dismiss—and the two opinions upon which he principally relies, *Hall* and *Pipkins*—ignore these differences. Mr. Evans simply assumes without explanation that the injunction discussed in *O'Shea* interrupted state court proceedings so the very different injunction requested here must do so as well. This assumption does not survive even cursory examination.

---

[10] As discussed *infra* at n.17, *Hall*'s factual determination that the plaintiffs' requested relief would interrupt state proceedings is likely incorrect.

In *O'Shea*, the plaintiffs were criminal defendants who alleged that their constitutional rights had been violated in various respects during their criminal cases. *See O'Shea*, 414 U.S. at 490–91. In order to halt these alleged violations, the plaintiffs sued the judges who presided over their cases. *See id.* For relief, the plaintiffs sought to enjoin the judges from issuing rulings or orders in ongoing criminal prosecutions. *See id* at 492, 500–02. Specifically, the plaintiffs requested an injunction that would permit them to: challenge individual rulings by the judges in the midst of criminal prosecutions; halt those prosecutions while a federal judge considered the constitutionality of the state court's ruling; and obtain an order from the federal judge that effectively reversed the state court's ruling. *See id.* at 502.

This kind of interruption does not inhere in every request for equitable relief that touches upon a state criminal proceeding. It is determined by the identity of the plaintiffs and the defendants, and the nature of the relief sought. In *O'Shea*, it resulted from the fact that the plaintiffs were parties to state proceedings; that they sought to enjoin the actions of the person conducting those proceedings;[11] and that they sought equitable relief that had to be granted in the midst of the proceedings themselves. This confluence of factors made the interruption of state prosecutions inevitable in *O'Shea*. But the fact that an injunction in that case would interrupt state proceedings does not mean that a different injunction brought by a different class of plaintiffs against a different defendant seeking different relief would also interrupt state proceedings.

---

[11] The companion case to *O'Shea*—*Spomer v. Littleton*, 414 U.S. 514, 520–21 (1974)—provides further support for Plaintiffs' argument that abstention is inappropriate here. The lawsuit in *O'Shea* involved claims against both state court judges and the State's Attorney, *see O'Shea*, 414 U.S. at 490; however, the Supreme Court considered the claims against the judges and the State's Attorney separately. While the Court reversed the claims against the judges in *O'Shea* on standing and abstention grounds, *see id.* at 493, 504, it declined to resolve *Spomer* on those grounds. Instead, it remanded the case for a determination whether the plaintiffs' complaint was moot because a new prosecutor had been elected, and whether plaintiffs should be permitted to amend their complaint and name the new prosecutor. *Spomer*, 514 U.S. at 522–23. If *O'Shea* applied to lawsuits against prosecutors, the Court would have resolved *Spomer* and *O'Shea* on the same grounds.

25

Plaintiffs' request for injunctive relief in this case is straightforward: "a permanent injunction forbidding the Defendant and his agents, employees and successors in office from maintaining a custom, usage and/or policy of exercising peremptory challenges against prospective Black jurors because of their race." Compl., Prayer for Relief ¶ C.

Unlike in *O'Shea*, the injunction requested here will not interrupt state court proceedings. First, Plaintiffs in this case are prospective jurors, not criminal defendants. Thus, Plaintiffs are not parties to the state-court proceedings. If Mr. Evans strikes them with a peremptory challenge, they will leave the courtroom, and the trial will proceed uninterrupted. Second, the requested injunction cannot interrupt jury selection. Plaintiffs do not have a right to sit on a specific petit jury, see *Powers*, 499 U.S. at 409, and thus, they cannot request that this Court halt jury selection and order their reinstatement as jurors. Third, Plaintiffs have not sought to enjoin individual discriminatory decisions by Mr. Evans. They have requested an injunction that halts his policy, custom, or usage of discriminating against Black jurors. Reviewing and reversing individual jury selection decisions is neither necessary nor appropriate to the enforcement of such an injunction.[12] Finally, because Plaintiffs did not sue the state court judges who preside over criminal proceedings, enforcement of the injunction would not require this Court to review the decisions of state court judges.[13]

---

[12] Even if it were legal for Plaintiffs to request that jury selection be halted while a federal court consider the constitutionality of their exclusion, such an interruption is practically impossible. Prosecutors do not announce why they have struck a juror, and jurors will not know why they have been removed from a specific jury. If a juror is removed, they will not challenge their removal in federal court even if they are aware of the lawsuit and aware that they may be entitled to seek relief, which is itself unlikely. Finally, even if a Plaintiff does seek relief in federal court, by the time they bring the issue to the Court's attention, jury selection would almost surely be finished, and the Court would not be positioned to interrupt it.

[13] The fact that the defendant in this lawsuit is not a state judge is also important in another respect. *Younger* and *O'Shea* are motivated by a special solicitude for state courts, and by the concern that intervention in state proceedings "entail[s] an unseemly failure to give effect to the principle that state courts have the solemn responsibility, equally with the federal courts 'to guard, enforce and protect every right granted or secured by the constitution of the United States.'" *Steffel*, 415 U.S. at 460–61 (citation omitted). This concern is most keenly felt where, as in *O'Shea* and *Younger*, a federal injunction would result in the "determination of . . . claim[s] ab initio" by the federal court—that is, where federal courts would decide

Mr. Evans' argument also errs by underestimating both the flexibility of equitable relief and the role of this Court in enforcing any relief that it grants. "'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.'" *Milliken v. Bradley*, 418 U.S. 717, 808–09 (1974) (quoting *Brown v. Board of Education*, 349 U.S. 294, 300 (1955)). This Court will determine the scope of any injunction that it enters and will oversee its implementation. There is no reason that either the drafting or the implementation of the injunction need be done without sensitivity to valid state interests and the avoidance of unnecessary intrusions into state actions. If this Court is concerned about the comity concerns that stem from an interruption of state prosecutions, it can address that concern in full just by deciding that it will not order relief that interrupts state proceedings.

Finally, it may be helpful to consider how the enforcement of an injunction might proceed. If this Court agreed with Plaintiffs' allegations and enjoined Mr. Evans from continuing his policy, custom, and/or usage of discriminating against Black jurors, enforcement of that injunction would likely occur as follows: Plaintiffs, acting through counsel, would file a motion with this Court seeking relief. Plaintiffs would present evidence that Mr. Evans' office continued to systematically strike Black jurors in contravention of this Court's order. If this Court found that Plaintiffs' contentions were correct, Plaintiffs would seek censure, contempt, or some other graduated sanction against Mr. Evans. They would not seek to interrupt any court proceeding. Consequently, the concerns that made abstention appropriate in *O'Shea* would be entirely absent. And Mr. Evans' office could ensure that no enforcement actions ever arise simply by following its constitutional obligation to select juries without regard to the race of the prospective jurors.

---

issues pending in specific state court cases and decide them in the first instance. *See O'Shea*, 414 U.S. at 501. Given the relief requested in this case, that concern is entirely absent. *See also infra* at 26.

Because Plaintiffs' requested relief would not interrupt any state proceedings, abstention is impermissible.

> **2.** **The Plaintiffs are not parties to proceedings in Mississippi's Fifth Circuit Court District and therefore have no adequate remedy at law in those proceedings.**

"The operation of the *Younger* doctrine is dependent upon the ability of the state courts to provide an adequate remedy for the violation of federal rights . . . ." *DeSpain v. Johnston*, 731 F.2d 1171, 1178 (5th Cir. 1984) (citation omitted). Thus, courts may not abstain where federal plaintiffs lack an "adequate opportunity" to litigate their constitutional challenge in the underlying state proceedings. *Middlesex Cty.*, 457 U.S. at 432.[14] This requirement is central to the justification for federal abstention. Both *Younger* and *O'Shea* are premised on the doctrine that courts of equity should not "'restrain a criminal prosecution[] *when the moving party has an adequate remedy at law*.'" *O'Shea*, 414 U.S. at 499 (quoting *Younger*, 401 U.S. at 43–44) (emphasis added). Where no adequate remedy exists, the justification for abstention vanishes, and federal courts are bound by their "virtually unflagging" "'obligation' to hear and decide a case." *Sprint Commc'ns, Inc.*, 571 U.S. at 77. For this reason, the *O'Shea* Court did not stop its legal analysis after determining that the challenged injunction would interrupt criminal prosecutions. It still considered whether the available "remedies at law" were "inadequa[te]." *Id.* at 502. The Court only decided that abstention was appropriate after determining that the plaintiffs could adequately litigate their constitutional challenges in their underlying state cases, and it based its decision on the availability of adequate state-court remedies. *See id.* at 502–03 (finding abstention appropriate given "the availability of other avenues of relief open to respondents for the serious conduct they assert").

Unlike the plaintiffs in *O'Shea* and *Younger*, the plaintiffs here have no adequate

---

[14] Mr. Evans does not discuss this requirement in his motion to dismiss.

opportunity in the state proceedings to litigate their constitutional challenge. In fact, they have no opportunity to litigate their challenge at all. The plaintiffs are all potential jurors,[15] and "[p]otential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion." *Powers*, 499 U.S. at 414–15 (1991). Thus, there is a dispositive distinction between plaintiffs here and the plaintiffs in both *Younger* and *O'Shea*—and also the plaintiffs in each of the Fifth Circuit abstention cases cited by Mr. Evans.[16] The availability of adequate state remedies is a *sine qua non* for abstention by a federal court. *See Middlesex Cty.,* 457 U.S. at 432. Because plaintiffs in this civil lawsuit cannot adequately litigate their constitutional challenges in the criminal cases where they are called as jurors, abstention under *O'Shea* is impermissible, and Mr. Evans' motion should be denied.[17]

### C.   Declaratory Relief Is Appropriate in This Case.

Mr. Evans contends that this Court should deny plaintiffs' request for a declaratory

---

[15] This includes the members of the Attala County NAACP.

[16] *See Ballard v. Wilson*, 856 F.2d 1568 (5th Cir. 1988) (plaintiff was criminal defendant); *Parker v. Turner*, 626 F.2d 1 (6th Cir. 1980) (plaintiffs were indigent fathers with pending state court orders requiring alimony or child support payments); *Gardner v. Luckey*, 500 F.2d 712 (5th Cir. 1974) (plaintiffs were criminal defendants); *Tarter v. Hury*, 646 F.2d 1010 (5th Cir. 1981) (plaintiff was criminal defendant). The plaintiffs in these cases also sought injunctions that would interrupt the state proceedings in which they were parties, which also renders them irrelevant to the resolution of this case.

[17] Both *Pipkins* and *Hall* committed a basic error of law by ignoring the fact that abstention is only permissible where Plaintiffs have an adequate opportunity to press their constitutional challenge in the underlying state proceedings. *See Hall*, 849 F. Supp. 2d at 1336–40; *Pipkins v. Stewart*, No. 5:15-cv-2722, 2019 WL 1442218, at *8–11 (W.D. La. Apr. 1, 2019). In *Pipkins*, the district court declined to abstain on *Younger* grounds. *Id.* at *8. But the district court then ruled that *O'Shea* was a separate abstention doctrine not bound by the requirements of *Younger* or *Middlesex*, while it acknowledged no Fifth Circuit authority for that position. *Id.* at *8–9. The court simply ignored the fact that *O'Shea* itself conditions abstention on the opportunity of the federal plaintiffs to press their claims in the state proceedings. *O'Shea*, 414 U.S. 499, 502. The *Pipkins* plaintiffs, like those in this case, have no such opportunity. Because some of the *Pipkins* plaintiffs also had damages claims that are not subject to abstention, that case is still pending in the district court and has not been appealed to the Fifth Circuit as of the date of this filing. Similarly, in *Hall*, the district court assumed that *O'Shea* applied without confronting the condition that *O'Shea* applied only in cases where the federal plaintiffs had an adequate remedy in the state proceeding—a remedy that no plaintiff in *Hall* possessed. *See Hall*, 849 F. Supp. 2d at 1337–40.

judgment based on the ruling in *Pipkins v. Stewart*, No. 5:15-cv-2722, 2019 WL 1442218 (W.D. La. Apr. 1, 2019). There, the court stated hyperbolically that "[i]t is difficult to overstate the magnitude of chaos that would ripple out from a federal declaratory judgment" that the District Attorney has systematically removed Black jurors because of their race. Def.'s Mem. at 24 (quoting *Pipkins*, 2019 WL 1442218, at *11). "Such a judgment would conceivably call into question most criminal convictions in Caddo Parish" and would violate the principles of federalism and comity espoused in *O'Shea*. *See id.* Mr. Evans' argument is incorrect, and because declaratory relief is appropriate in this case, abstention is inappropriate.

*Pipkins*' claims regarding the "chaos" that would stem from a declaratory judgment pay little heed to the rules of criminal procedure or the limited reach of *Batson*. Once an individual has been convicted of a criminal offense, his ability to challenge that conviction is subject to tight time limits and to various restrictions regarding preservation and other procedural requirements. Presumably, few, if any, individuals exist who possess preserved, timely *Batson* challenges *and* will choose to raise those challenges on appeal or post-conviction solely because this Court issued a declaratory judgment.

Furthermore, Mr. Evans' argument overstates the impact that a declaratory judgment can have on any case where an individual does raise a *Batson* challenge. A finding by this Court that Mr. Evans' office employs a policy, custom, or usage of racial discrimination in jury selection, standing alone, would not be sufficient to require that a criminal conviction be reversed or vacated. Any defendant seeking relief still must prove that their trial prosecutor struck a specific juror "for a discriminatory purpose." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019). "[H]istorical evidence of racial discrimination by the District Attorney's office" is "accord[ed] some weight" in the inquiry but is not dispositive. *Miller-el v. Cockrell*, 537 U.S. 322, 346 (2003). If such a finding

were sufficient, then the holding in *Flowers* alone would open the proverbial floodgates of litigation for convicted appellants or post-conviction petitioners.

Finally, the "principles of federalism, comity, and equitable restraint" do not support the refusal to issue a declaratory judgment. A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus. *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 93 (1947). The Supreme Court has explained that the availability of declaratory relief offers a "milder alternative" to the general injunction remedy. *See Steffel*, 415 U.S. at 466. "[E]ngrafting" the "traditional equitable prerequisites" to the issuance of injunctive relief onto the issuance of declaratory judgments "would defy Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate." *Id.* at 471. Indeed, declaratory relief furthers the goals of federalism and comity by permitting federal courts to follow their mandate and decide the cases before them without interfering in state court matters that lie outside the limits of their equitable authority.

In sum, no "chaos" would ensue from the issuance of a declaratory judgment, and Mr. Evans' generic appeal to equitable principles does not support the relief he requests. Even if this Court finds that injunctive relief is inappropriate, it should not withhold declaratory relief, which is essential to ending Mr. Evans' misconduct.

### D. Abstention Is Inappropriate in this Case Because It Is Inconsistent with the Congressional Intent Behind Section 1983.

This Court should also reject Mr. Evans' expansive view of abstention because it is inconsistent with the intent of the 42nd Congress, which enacted § 1983. Following the Civil War, the Reconstruction Congresses transformed "the concepts of federalism that had prevailed in the late 18th century." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Through the Fourteenth Amendment and the Civil Rights Acts of 1866 and 1871, Congress "clearly established" "the role

31

of the Federal Government as a guarantor of basic federal rights against state power." *Id.* at 238–39. *See also Monroe v. Pape*, 365 U.S. 167 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); Donald H. Zeigler, *A Reassessment of the* Younger *Doctrine in Light of the Legislative History of Reconstruction*, 1983 Duke L.J. 987, 992–1020 (1983) [hereinafter *Reassessment of the* Younger *Doctrine*]. By passing the Fourteenth Amendment and enacting rounds of enforcement legislation, Congress sought "to accomplish a systemic reform of southern criminal and civil justice systems." *See id.* at 989 (footnote omitted). "[F]ederal courts were to be the primary enforcers of this program . . . ." *Id.* at 990.

Section 1983 played a central role in this effort. Originally enacted as § 1 of the Civil Rights Act of 1871, the "very purpose of § 1983 was to interpose the federal courts between the States and the people." *Mitchum*, 407 U.S. at 242. "It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because . . . the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." *Monroe*, 365 U.S. at 180.

"To the Reconstruction Congresses, abstention was anathema." *Reassessment of the* Younger *Doctrine*, at 1020. In 1866, Congress enacted the Freedmen's Bureau Bill—a forebear of § 1983—and "Congress specifically and overwhelmingly rejected the concept of abstention" during its debate on the bill. *See id.* at 998. When Congress debated the Civil Rights Act of 1871—of which § 1983 was then § 1—it reached the same conclusion: "Congress did not intend the federal courts to withhold section 1 remedies if the complainants could seek relief in the state courts." *See id.* at 1017. As the *Mitchum* Court explained: "The legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to . . . federally created rights; it was concerned that state instrumentalities

could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." 407 U.S. at 242. Congress did not intend for federal courts to abstain from § 1983 cases when they would interfere with state courts; Congress enacted § 1983 *to enable interference* with state courts.

Congress's intent counsels a narrow construction of *O'Shea*. Although the Court did not consider Congressional intent when it decided *O'Shea*, the Court's more recent decisions have emphasized the importance of respecting Congressional intent when considering other issues that implicate separation-of-powers concerns like exhaustion and implied causes of action.[18] At the time that the Court enacted *Younger* and *O'Shea*, the Court's cases involving exhaustion and implied rights of action paid relatively little mind to Congressional intent. *See, e.g.*, *Cort v. Ash*, 422 U.S. 66, 78 (1975) (explaining four-factor test for whether exhaustion is appropriate); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) (assuming that it was a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose). *Younger* and *O'Shea* proceeded in a similar manner. In the *Bivens* context, the Court now refers to this earlier period as the "'*ancien* regime.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (citation omitted).

Shortly after the Court decided *O'Shea* and *Younger*, it reassessed the centrality of legislative intent to analyses of exhaustion and implied causes of action. Thus, in *Patsy v. Board of Regents*, the Court ruled that "legislative purpose . . . is of paramount importance in the

---

[18] *See, e.g.*, *Felder v. Estelle*, 693 F.2d 549, 553 (5th Cir. 1982) (noting similarities between *Younger* abstention and exhaustion); Martin H. Redish, *Abstention, Separation of Powers, and the Limits of the Judicial Function*, 94 Yale L.J. 71, 114–15 (1984) (noting that both judge-made abstention doctrines and the decision to infer a private right of action implicate similar separation-of-powers concerns because "they can undermine a carefully structured statutory goal"). Each doctrine creates a similar risk that the federal courts will thwart Congressional intent, though "judge-made abstention poses a considerably greater risk of judicial usurpation" than the others. *See id.* at 72 n.5.

exhaustion context," and "a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent." 457 U.S. 496, 501–02 (1982). Similarly, in the context of implied causes of action, the Court now ruled that "the judicial task was . . . 'limited solely to determining whether Congress intended to create the private right of action.'" *Ziglar*, 137 S. Ct. at 1856 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 589 (1979)).

Like exhaustion and implied causes of action, judicial abstention raises serious separation of powers concerns because "Congress has the constitutional authority to define the jurisdiction of the lower federal courts," *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993), and abstention amounts to judicial law-making that changes the terms of Congress's jurisdictional grants.[19] *See generally* Redish, *supra* note 19. In so doing, judge-made "abstention conflicts with congressional goals embodied in the seemingly unlimited grants of jurisdiction." *Id.* at 78. The conflict is particularly stark in the case of abstention pursuant to *O'Shea*, where Congress expressly considered and rejected abstention as a limitation on its grant of jurisdiction. *See Reassessment of the* Younger *Doctrine*, at 1018. In a situation where Congress specifically vested jurisdiction in the federal courts because it believed that state officers and state courts might "be antipathetic to the vindication" of African Americans' rights under the Fourteenth Amendment, *see Mitchum*, 407 U.S. at 242, the Supreme Court's decision to nullify that decision by ruling that abstention is required raises profound separation of powers concerns.

In *Ziglar*, the Court explained that such tension between Congressional intent and prior

---

[19] Prof. Redish explained the separation of powers concerns in the following terms: "Well accepted principles of separation of powers mandate that an electorally accountable legislature make the basic policy decisions concerning how the nation is to be governed. The authority to make these policy decisions necessarily includes the authority to employ the federal judiciary to enforce the substantive statutory programs adopted by Congress. Absent a finding of unconstitutionality, it is not the judiciary's function to modify or repeal a congressional enforcement network unless Congress has clearly delegated such authority to the judiciary." Redish, *supra* note 18, at 115.

decisions should be resolved by narrowly cabining the earlier decision and declining to apply it to new factual or legal contexts. *Ziglar* addressed the question whether to recognize a new implied right of action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). In the same term that it decided *Younger*, the Court had created a private right of action in *Bivens* without considering Congressional intent. *See id.* Given the Court's post-*Bivens* decision to focus on Congressional intent when determining whether to recognize an implied right of action, the *Ziglar* Court ruled that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," though *Bivens* itself remains settled law. *See Ziglar*, 137 S. Ct. at 1857 (citation omitted). Now, when Plaintiffs seek to apply *Bivens* to a new context, "courts must refrain from creating the remedy" "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Id.* at 1858. This approach is necessary "to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* (emphasis added).

Similarly, in order to "respect the role of Congress in determining the nature and extent of federal court jurisdiction under Article III," courts should not extend *O'Shea* to new contexts if "there are sound reasons to think that Congress might doubt" the propriety of that extension. *Id.* In this case, where Black plaintiffs have alleged that a state prosecutor has discriminated against them in violation of the Fourteenth Amendment, Congressional intent plainly counsels against abstention—especially because that discrimination deprives them of a basic right of citizenship. Thus, this Court should not extend *O'Shea* to the new context presented by this case. To the extent that *O'Shea* may apply to this case already—which it does not—*O'Shea* is wrongly decided.

Respectfully submitted,

/s/ Christopher E. Kemmitt
Christopher E. Kemmitt*

35

NAACP LEGAL DEFENSE &
   EDUCATIONAL FUND, INC.
700 14th Street, NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (202) 682-1312
ckemmitt@naacpldf.org

Liliana Zaragoza*
NAACP LEGAL DEFENSE &
   EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
lzaragoza@naacpldf.org

/s/ James Craig
James Craig, MS Bar No. 7798
Emily Washington*
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119
Phone: (504) 620-2259
Fax: (504) 208-3133
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing document with the

Clerk of this Court using the ECF system which transmitted a copy to all counsel of record.

Dated: February 3, 2020.

*/s/ Christopher E. Kemmitt*
Christopher E. Kemmitt
